533 F.2d 668
 42 A.L.R.Fed. 1, 174 U.S.App.D.C. 441
 COMMONWEALTH OF PENNSYLVANIA, By Milton J. SHAPP, its
Governor, et al., Appellants,
v.
Thomas S. KLEPPE, as Administrator of the Small Business
Administration, et al.
 No. 74-1960.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued 30 Oct. 1975.
Decided 4 March 1976.
Rehearing Denied May 3, 1976.
 
 Norman J. Watkins, Deputy Atty. Gen., Harrisburg, Pa., with whom Israel Packel, Atty. Gen., and Lawrence Silver, Deputy Atty. Gen., Harrisburg, Pa., were on the brief for appellants.
 Mary Elizabeth Medaglia, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Thomas G. Corcoran, Asst. U. S. Attys., Washington, D. C., were on the brief for appellees.
 Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and WILKEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILKEY.
 Dissenting opinion filed by Senior Circuit Judge LUMBARD.
 WILKEY, Circuit Judge:
 
 
 1
 In late June of 1972 the mid-Atlantic coastal region was battered by the winds and inundated by the rains of Hurricane Agnes. The states of Pennsylvania, Maryland, and Virginia were designated major disaster areas[1] and thereby became eligible for special assistance from the Small Business Administration.[2] On 27 June 1972 the SBA announced that disaster relief would be made available to the devastated areas, and for administrative purposes[3] classified the three affected states as Class B disaster areas.
 
 
 2
 Dissatisfied with the program of relief offered by the SBA, and in part to enjoin discontinuance of the relief effort, the State of Pennsylvania[4] brought the present action in the District Court in early 1974. The complaint alleged that the state had standing to sue (1) on its own behalf, (2) as parens patriae for all its citizens allegedly injured, and (3) as parens patriae upon the relation of four named individuals. Respondent filed a motion to dismiss which, after oral argument, was granted by Chief Judge Jones, on the ground that plaintiff lacked standing to sue. Petitioner appeals from the written order of 12 August 1974 dismissing the suit.[5]
 
 
 3
 In presenting the problem of state standing, this case beckons us into one of the least well-illuminated corners of a legal area of which it has been said that "generalizations . . . are largely worthless as such,"[6] and outcomes are "more or less determined by the specific circumstances."[7] Of standing doctrine in general, little can be said with certainty except that recent years have seen an expansion of the classes of persons eligible to bring suit.[8] The question of state standing embodies the basic standing question "of the nature and sufficiency of the litigant's concern with the subject matter of the litigation,"[9] but is further confused by a variety of issues contingent upon the capacity in which the state brings suit and the parties against whom it is brought. The relatively few recent Supreme Court opinions discussing the issue of state standing to sue[10] are of some help in ameliorating the resulting uncertainty. However, to a great extent we are left to make our way by the light of opinions written decades ago, whose continuing authority is at least colored by the recent trend toward liberalized standing.
 
 
 4
 At the outset, we can say with certainty that petitioners have set forth two theories of standing which, in some contexts, will support prosecution of an action by a state. First, they have asserted that the state itself is a party injured by wrongful acts of the respondent. It is well settled that a state, like any institution, may sue for legal injuries to its proprietary interests.[11] Second, in bringing the action also on behalf of all injured citizens of the state, and upon the relation of four named individuals, Pennsylvania invokes a parens patriae theory of standing. At least in some instances a state may thus sue to vindicate the interests of its citizens.[12] We now turn to a consideration of whether the circumstances of this case are such as will support action by the state on either theory.
 
 I. Proprietary Interest Basis for Standing
 
 5
 The disaster loan program whose operation is the subject of the suit is limited to direct loans for the assistance of small business concerns.[13] Thus there could be, and is, no allegation that aid was illegally denied, either to the state or to some program administered by it. Rather petitioners appear to assert that the state suffered harm by injury to the economy, health, safety, and welfare of its people, by impairment of its ability to look after the well-being of its citizens, and by reduction of state tax revenues.[14]
 
 
 6
 The alleged injuries to the state's economy and the health, safety, and welfare of its people clearly implicate the parens patriae rather than the proprietary interest of the state. They involve no harm to the state beyond the individualized harms to her citizens, and thus if relief is to be granted it must be on the theory of the state as representative of those private interests.[15]
 
 
 7
 The allegations as to the state's duty to look after the well-being of its citizens, and the reduction of its tax revenues, come closer to stating a legitimate interest in the state itself. The alleged injuries are not directly attributable to individual citizens of the state, and insofar as they are cognizable by the court, appear to involve the interests of the state as an independent entity. However, invoking the test of Data Processing Service v. Camp,[16] we conclude that the alleged injuries do not satisfy the requirement of being arguably within the zone of interests protected by the Small Business Act.
 
 
 8
 The Small Business Act,[17] under whose authorization the controverted activities were carried on, was enacted for the narrow purpose of assisting small business in a number of ways. The Act itself expresses no broader purpose than the actual provision of aid to small business concerns, except to recognize that such small concerns are essential to the preservation of a freely competitive economy.[18] The substantive sections of the Act provide for various forms of assistance running directly from the SBA to the business concerns themselves. Unlike many federal assistance programs,[19] no aid is authorized to be channelled through state agencies or coordinated with state programs. Nor do we find anything in the legislative history of the Act[20] to indicate any concern for the well-being of the states as distinct political units.
 
 
 9
 We also find it highly questionable that petitioners have made sufficient allegation of injury in fact. While it is clear that cognizable injuries need not be economic in nature,[21] we have great difficulty conceptualizing in any coherent way the asserted injury to the state per se through the alleged impairment of its ability to fulfill duties owed to its citizens. One might draw from petitioner's language an implication of injury to the state's reputation for fulfilling its moral undertaking to care for its citizens. However, even if this type of injury to reputation is substantial enough under the liberal Data Processing standard, which we doubt, it is doubtful that the injury could be said to be caused by the alleged wrongful acts. If the state did, in some sense, commit itself to maintain a certain level of security against the consequences of natural disasters, any injury to its reputation for failure to meet that commitment would appear to proximately result from the action or inaction of the state itself. This appears necessarily to be true, at least in cases like the present one where there is no assertion of active disruption of state relief efforts.
 
 
 10
 The allegation that tax revenues were reduced embodies a comprehensible harm to the economic interests of the state government. However, it appears to us likely that this is the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing.[22] The parallel to the cases imposing very strict limits on taxpayer standing is imperfect, since it can not be said of the state that its economic interest is no different than those of many others. Still, the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing. By analogy to the taxpayer standing cases, it seems appropriate to require some fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged. This would prevent state standing in cases like the present one, where diminution of tax receipts is largely an incidental result of the challenged action.[23]
 
 
 11
 We therefore conclude that neither the impairment of the state's ability to look after its citizens nor the diminution of its tax revenues constitutes sufficient injury to state proprietary interests to confer standing.
 
 II. Parens Patriae Basis for Standing
 
 12
 The standing of states to bring parens patriae actions on behalf of their citizens has undergone substantial expansion beyond the traditional common law representation of "persons under legal disabilities to act for themselves."[24] In particular circumstances, courts have relied on parens patriae reasoning to uphold state representation of a variety of interests, in actions against other states,[25] against private entities,[26] and, in a few instances, against agencies of the Federal Government.[27]
 
 
 13
 However, there are also a significant number of cases in which states have been refused the right to serve in such a representative capacity, and the reasons for the divergent holdings are not always readily apparent. Because of the variety of policy concerns which may be implicated depending upon the factual context of the action, no monolithic principle of parens patriae standing can be formulated. Any answer to the question whether a state may sue on behalf of its citizens must be qualified by statement of the type and extent of the interests to be represented, and of the defendants against whom the action is brought.
 
 
 14
 A. Interests Which a State May Represent.
 
 
 15
 The nature of the interest which a state seeks to represent is the most readily apparent element governing parens patriae standing. While one can not conclusively determine that the requisites of standing are present from this factor alone, the cases make clear that some interests are an inadequate basis for standing under all circumstances.
 
 
 16
 Leaving aside the long recognized power of the state to represent the legally incompetent and the unknown,[28] it appears that states suing parens patriae are limited to causes in which the state itself can be said to have a quasi-sovereign interest.[29] The essential characteristics of this quasi-sovereign interest are not explicitly set out in the case law. Further, it appears that the meaning of the term may have undergone some expansion over time.
 
 
 17
 The earliest cases[30] allowing a state to sue as representative of its citizenry involved the protection or preservation of land or other natural resources. The state's concern did not arise from a direct property interest of its own, but from its sovereignty over all territory within its boundaries. While the state thus lacked standing to sue in its own right, it was found to be a proper party to bring suit because of its residual "interest independent of and behind the titles of its citizens, in all the earth and air within its domain."[31] On this theory of quasi-sovereignty, state actions were allowed contesting diversion of interstate waters[32] and various types of interstate pollution.[33]
 
 
 18
 Although the reference to state sovereignty suggests an essential territorial or natural resource dimension in the interest to be represented, it soon became clear that parens patriae standing might exist absent any connection with the state's sovereign power over the land. Not long after parens patriae standing was allowed in the water and pollution contexts, the Supreme Court recognized that states also have an underlying interest in the continuing prosperity of their economies. It upheld state standing to challenge actions whose clear and direct effects would be the substantial disruption of the state's internal economy and impairment of the well-being of the citizenry.[34] While the Court did not state at that time whether this concern for the general welfare is within the previously recognized category of quasi-sovereign interests, it has subsequently made clear that it is, most recently in the case of Hawaii v. Standard Oil Company.[35]
 
 
 19
 The nature of the economic or welfare interest necessary to justify state standing is one of the more obscure issues with which we must deal. The valid though largely unhelpful generality which guides us is that the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens.[36] However, in view of the substantial interrelationship of all economic activity, no clear demarcation is possible between individualized harms and injury to the economy as a whole. This appears to be one area where the sufficiency of the injury actually alleged is highly contingent upon other relevant factors bearing on the appropriateness of letting the plaintiff state pursue the case on the merits.
 
 
 20
 At one extreme, it is entirely clear that a state never has standing on the basis of personal claims assigned to it by individuals.[37] It also seems well established that there can be no standing in the state where the primary thrust of an alleged wrong is injury to a narrowly limited class of individuals, and the harm to the economy as a whole is insignificant by comparison.[38] However, in some cases, it has been held sufficient that the direct impact of the alleged wrong be felt by a substantial majority, though less than all, of the state's citizens, so that the suit can be said to be for the benefit of the public.[39] And even where the most direct injury is to a fairly narrow class of persons, there is precedent for finding state standing on the basis of substantial generalized economic effects.[40]
 
 
 21
 It thus appears that injury to the state's economy or the health and welfare of its citizens, if sufficiently severe and generalized, can give rise to a quasi-sovereign interest in relief as will justify a representative action by the state. The cases indicate not only that the nature and degree of essential harm can not be characterized with any precision,[41] but that factors other than the degree of injury are influential in determining state standing. One of these which is in great measure dependent upon the nature of the injury alleged, is the presence or absence of a more appropriate party or parties capable of bringing the suit.[42] However, it also appears that the sufficiency of the state interest asserted may sometimes be influenced by policy concerns arising from the context of the suit quite apart from the injury itself. The most important of such considerations is the defendant against whom the action is brought.
 
 
 22
 B. Identity of Defendant Parties as a Factor Determining Parens Patriae Standing
 
 
 23
 In actions against private entities, the question of state standing largely reduces to an analysis of the injury suffered, and the attendant factors set out above. The private nature of the defendant does not, of itself, import any substantial considerations, either pro or con, affecting the question of state standing.[43] However, when a state seeks to sue either another state, or some branch of the federal government, significant policy concerns, apart from the injury itself, become relevant in determining the state's fitness to bring suit. For the most part, these concerns involve the proper allocation of authorities within the federal system.
 
 
 24
 A substantial proportion of the cases in which parens patriae standing has been allowed have been actions between two states.[44] That this is so may be partly attributable to the Supreme Court's longstanding recognition[45] of its constitutional duty to resolve interstate controversies which, before the Constitution, were settled by diplomacy and negotiation.[46] "Diplomatic powers and the right to make war having been surrendered to the general government, it was to be expected that upon the latter would be devolved the duty of providing a remedy . . . ."[47] The opportunity to act as such an arbiter of interstate disagreements arises from the Supreme Court's original jurisdiction over controversies between states.[48] The duty to so act arises from the exclusivity of that jurisdiction,[49] and the absence of adequate alternative avenues of redress.
 
 
 25
 Therefore, the presence of a state defendant provides added impetus to recognize standing to sue wherever the interests of the state are substantially implicated that is wherever standing is already reasonably clear.[50] In reasoning from the precedents of interstate cases which have upheld standing, it is important to keep in mind that an action involving other than a state defendant does not raise any such concern for the resolution of interstate disputes. Therefore if other circumstances of the action suggest important arguments for denying state standing, analysis may indicate that standing should be denied, even if the interest to be represented seems superficially similar to that held an adequate basis for standing in an interstate suit.
 
 
 26
 In some cases like the present one, where the defendant is not a state but some agency of the Federal Government, such important arguments for denying state standing do exist. The individual's dual citizenship in both state and nation, with separate rights and obligations arising from each, suggests that both units of government act as parens patriae within their separate spheres of activity. The general supremacy of federal law gives some reason to conclude that the federal parens patriae power should not, as a rule, be subject to the intervention of states seeking to represent the same interest of the same citizens. In the terms used by the parens patriae cases, the state can not have a quasi-sovereign interest because the matter falls within the sovereignty of the Federal Government.
 
 
 27
 The Supreme Court has repeatedly recognized (as a factor governing state standing) this interest of the Federal Government in the exclusivity of its parens patriae powers. The first and still dominant case in the field is Massachusetts v. Mellon,[51] where the state sought to sue on behalf of its citizens to enjoin enforcement of an allegedly unconstitutional act of Congress. While it is debatable whether the Court in that case meant to bar all state parens patriae suits against the Federal Government, the opinion makes clear at least that the federal interest will generally predominate and bar any such action.[52] The substantial importance of this federalism interest has been repeatedly recognized, both in opinions which offered it as the primary grounds for denying standing,[53] and in at least one case where standing was allowed, with the Court hastening to point out that no federal defendant was involved.[54] It is true that a few cases have allowed suits by states or their agencies, acting parens patriae, against the Federal Government. However, none of these cases should be viewed as a general rejection of the concern for exclusive allocation of federal parens patriae functions.[55]
 
 
 28
 As a result of this federalism interest, which reduces most basically to the avoidance of state interference with the exercise of federal powers, the cases evidence an extreme reluctance to recognize state parens patriae standing against a federal defendant. There is some basis for reading the preponderance of case law as flatly prohibiting such actions on the basis that there can be no quasi-sovereign interest in the state as a matter of constitutional allocation of powers. Whatever one's view of that proposition, however, it is at least clear that suits against the Federal Government raise an important argument against standing which is not relevant where other types of defendants are involved. That is because wherever there is a federal defendant, a degree of disruption of asserted federal powers at the hands of a plaintiff state is unavoidable. While the extent of the disruption and thus the weight of the federalism argument[56] will vary from one case to another, the applicability of the argument at all sharply distinguishes cases like the present one from the decisions cited by Petitioner involving a non-federal defendant.[57]
 
 
 29
 Further, most of the cases relied on by Petitioner involve state defendants, and many of those are distinguishable in another respect as well. In those instances where it is reasonably clear that some state interest is implicated,[58] the determination to grant standing is buttressed by the Supreme Court's constitutional duty to resolve interstate disputes. The combination of this pro-standing policy with the irrelevance of the anti-standing federalism concern for segregation of state and federal parens patriae functions, makes the logic of the interstate standing cases only marginally applicable to the situation before us.
 
 
 30
 C. Standing of Pennsylvania to Challenge SBA Classification of Hurricane Agnes
 
 
 31
 Pennsylvania seeks redress in this case for the injuries received by certain of its citizens and its economy as a whole, as a result of the allegedly illegal manner in which the SBA disaster relief was administered. While the record is not illuminating, it is our understanding that Agnes was a disaster of wide-ranging impact, whose physical effects were felt throughout much of the mid-Atlantic coastal region. It seems plausible that the dispersed effects of the disaster were felt in the economic condition of many small businesses, and that the manner of administration of SBA relief thus had direct importance for a significant number of small enterprises within the state.[59]
 
 
 32
 We need not and do not decide the difficult question of whether Pennsylvania would have standing if it were seeking somehow to represent the interests involved here against a private or state defendant. For in this case the uncertainty of that issue is made irrelevant by the presence of a federal defendant, and the fact that the suit is a direct attempt by a state to insert itself between the national government and the legitimate objects of its administrative authority. While we incline to the view that no asserted state interest in economy or welfare would support standing to challenge a program running directly between the Federal Government and the citizens, we limit our holding to the situation before us. In the face of the ambiguous state interest alleged by Pennsylvania, it seems clear that the state disruption of federal action implicit in granting state standing can not be tolerated here.
 
 
 33
 The gist of the challenge in this case goes to the question whether Pennsylvania citizens received the type and amount of assistance to which they were entitled under the statute. However, Petitioner attempts to prove its case by delving into the administrative structure and internal procedures of the Small Business Administration, and argues, in essence, that the assistance must have been statutorily inadequate simply because it was administered in a particular way. We are not asked to rule that a particular quantified level of assistance is less than required by law. Rather, Petitioner asks us to infer from the SBA's Class B disaster classification and the concomitant regional administration of assistance that the relief given must have been less than the statute required.[60]
 
 
 34
 We need not reach the merits of this alleged injury[61] to conclude that Petitioner's argument would take us very far into the internal workings of a federal agency. Indeed, it is difficult to imagine how a state could more substantially intrude itself into the operations of the Federal Government than by challenging agency activity on the sole basis that the agency chose to structure its effort in a particular way. The depth of this attempted invasion of matters traditionally reserved to broad agency discretion[62] weakens any claim of the state that it is a proper parens patriae representative of its citizens' interests in this matter. The federalism interest in keeping separate the state and national parens patriae functions, which the Supreme Court has often recognized and never denied,[63] appears to us an overwhelming consideration, as would predominate even if the arguments in support of standing were more powerful than they are here. We therefore hold that Pennsylvania lacks parens patriae standing to bring this action.
 
 
 35
 We find nothing in the modern trend toward liberalized standing which weighs significantly against the conclusion we have reached. None of the recent standing cases in the Supreme Court touch upon the federalism question before us, and most do not raise the questions as to constitutional allocation of powers which arise in all suits against the national government. The single important exception to the latter statement is the area of taxpayer suits against the Federal Government. While it appeared for a time that Flast v. Cohen,[64] might signal a substantial relaxation of constraints on taxpayer challenges to government action, recent cases have elucidated relatively strict limits on the Flast doctrine.[65] We therefore do not read that line of cases to indicate that the federal interest in avoiding the disruption of litigation is now any less intense than it once was.
 
 
 36
 We are aware that the United States Court of Appeals for the Ninth Circuit has recently recognized parens patriae standing in a state utility commission to challenge a decision of the FCC bearing upon the operation of entities also regulated by the plaintiff.[66] Without expressing any view as to the propriety of that decision, we note that it is distinguishable from our case in at least one important respect.[67] It was an action by a specialized utility[68] regulating agency of the state, dealing with matters within the expertise of that agency. The specialization of such an agency arguably befits it to stand in a parens patriae capacity for the citizenry on matters falling within its statutory mandate. It is conceivable that the agency's expertise makes it the best available representative of the plaintiff interests involved, and that the close interaction of state and federal regulation in the communications field renders less substantial the federalism interest in freedom from state intrusion. Thus even were the Ninth Circuit decision binding upon us, it would not compel a conclusion different from the one we have reached.
 
 
 37
 The District Court's dismissal of the action for failure to state a claim is
 
 
 38
 Affirmed.
 
 LUMBARD, Senior Circuit Judge (dissenting):
 
 39
 From June 21 to June 25, 1972, much of the eastern seaboard was ravaged by Hurricane Agnes, one of the worst natural disasters in the history of the United States. Pennsylvania, with a population in excess of 12 million people and the hardest hit of any state, here seeks to challenge the SBA's method of implementing federal relief programs in the Commonwealth, in the aftermath of devastation caused there by Agnes. The majority concludes that such a suit represents an untoward incursion into and usurpation of the federal sovereign power. I respectfully dissent.
 
 
 40
 The majority does not dispute, as indeed it could not, that the federal courts have in recent years been recognizing with increasing frequency the right of organizations to sue on behalf of their constituent members. See Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636, 645 (1972). In United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), for example, the Supreme Court held that "(v)arious environmental groups" had standing to attack ICC approval of a railroad rate surcharge which, plaintiffs alleged, would discourage the use of recyclable materials thereby adversely affecting the environment. In Environmental Defense v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970), this court similarly concluded that the interest of consumers in obtaining review of a decision by the Secretary of Agriculture refusing to suspend registration of certain pesticides containing DDT, "may properly be represented by a membership association with an organizational interest in the program." 428 F.2d at 1097.
 
 
 41
 Nor does the majority contest the now well-settled proposition that the state, as parens patriae, may sue both private individuals, Georgia v. Pennsylvania Railroad, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), and other states, Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901), to protect its quasi-sovereign interests. Nevertheless, relying on the precedent of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the court maintains that such suits cannot be countenanced when brought against the federal government.[1] I disagree.
 
 
 42
 In Mellon, Massachusetts alleged that a federal statute which conditioned a grant-in-aid upon voluntary compliance with a plan to reduce infant and maternal mortality constituted "an attempt to legislate outside the powers granted to Congress by the Constitution and within the field of local powers exclusively reversed to the states," 262 U.S. at 482, 43 S.Ct. at 599, 67 L.Ed. at 1083. In contrast, Pennsylvania's claim that the SBA erred in classifying the Commonwealth a Class B rather than Class A disaster area represents an effort to assure compliance with "the congressional will by preventing . . . a violation of (the Disaster Relief Act of 1970, 42 U.S.C. § 4401 et seq.) by the administrative agency charged with its enforcement." Washington Util. & Transp. Com'n v. FCC, 513 F.2d 1142, 1153 (9th Cir. 1975).
 
 
 43
 Moreover, Mellon was decided in a far different era when standing was limited to the vindication of "legal rights." Those days are long since passed. Data Processing Services v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Indeed, in Washington Utilities, supra, the Ninth Circuit just recently concluded that the Mellon doctrine did not preclude a suit by a public commission of the State of Washington challenging the determination of the FCC that "the public interest, convenience, and necessity" would best be served by authorizing the entry of new carriers into the specialized communications field. The majority endeavors to distinguish this squarely contrary holding by noting the "close interaction of state and federal regulation in the communications" area. But surely, the need for cooperation and coordination between state and federal governments is nowhere more obvious than in the administration of a massive disaster relief program.
 
 
 44
 The majority also seeks to dismiss in a footnote the contention that there is a valid distinction between a state's challenge to the constitutional authority of the central government to enact a given statute and an attack upon the manner in which a concededly lawful statute is enforced and administered, see fn. 56, supra. For me, however, this distinction is pivotal. The former is clearly and obviously a fundamental threat to the federal sovereign power; the latter seeks only to vindicate the will of the people as it has been expressed by their duly elected representatives in the national legislature.
 
 
 45
 At a time when suits such as the present one are routinely brought by private individuals and special interest groups, it makes little sense to deny Pennsylvania the right to test the propriety of actions by the SBA in bringing relief to thousands of the Commonwealth's citizens. There can be no doubt that with a natural disaster the size and scope of Hurricane Agnes, the state's interest in repairing the devastation to property within its borders and in accelerating the recovery of its economy is greater than the sum of the individual injuries suffered by its residents. See Georgia v. Pennsylvania Railroad, supra, 324 U.S. at 450-51, 65 S.Ct. at 723, 89 L.Ed. at 1059. In instituting this litigation, Pennsylvania has acted well within its parens patriae responsibilities.
 
 
 46
 I would reverse the order of the district court which dismissed the complaint on the ground that Pennsylvania has no standing to sue.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 Pursuant to the provisions of 42 U.S.C. § 4402(1) (1970), of the Disaster Relief Act of 1970
 
 
 [2]
 Pursuant to the provisions of 15 U.S.C. § 636(b) and 42 U.S.C. § 4451 (1970)
 
 
 [3]
 There is controversy in the record as to the precise effects of a Class B as opposed to a Class A disaster classification. There is general agreement that it resulted in relief administered from a regional rather than a national headquarters. There is disagreement, however, whether this classification bespeaks a lower priority in the allocation of SBA resources, and resulted in less total assistance than would have been received under the Class A designation. Brief of Petitioner at 3-4; Brief of Respondent at 3. See note 60 infra
 
 
 [4]
 The named officials bringing the action on behalf of the state were the Governor, the Secretary of Community Affairs, and the Attorney General
 
 
 [5]
 Appendix at 44a
 
 
 [6]
 Association of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 187 (1970)
 
 
 [7]
 United States ex rel. Chapman v. FPC, 345 U.S. 153, 156, 73 S.Ct. 609, 612, 197 L.Ed. 918, 925 (1953)
 
 
 [8]
 See, e. g., Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Investment Co. Inst. v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Hardin v. Kentucky Util. Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968)
 
 
 [9]
 H. Hart & H. Wechsler, The Federal Courts and The Federal System 174 (1953)
 
 
 [10]
 Hawaii v. Standard Oil Co., 405 U.S. 251, 257-60, 92 S.Ct. 885, 888-90, 31 L.Ed.2d 184, 189 (1972); Massachusetts v. Laird, 400 U.S. 886, 887-91, 91 S.Ct. 128, 129-31, 27 L.Ed.2d 130, 131-33 (1970) (Douglas, J., dissenting from denial of certiorari); South Carolina v. Katzenbach, 383 U.S. 301, 323-24, 86 S.Ct. 803, 815-16, 15 L.Ed.2d 769, 783-84 (1966)
 
 
 [11]
 See, e. g., Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); Oklahoma v. Civil Serv. Comm'n, 330 U.S. 127, 137-38, 67 S.Ct. 544, 550-557, 91 L.Ed. 794, 803 (1947)
 
 
 [12]
 See Hawaii v. Standard Oil Co., 405 U.S. 251, 257-60, 92 S.Ct. 885, 888-890, 31 L.Ed.2d 184, 189 (1972); Georgia v. Pennsylvania R. R., 324 U.S. 439, 445-46, 65 S.Ct. 716, 720-721, 89 L.Ed. 1051, 1055 (1945)
 
 
 [13]
 15 U.S.C. § 636(b); 42 U.S.C. § 4451 (1970)
 
 
 [14]
 Petitioners' allegations of proprietary injury are sketchy and uncertain. The complaint does not go beyond the unexpanded statement that Pennsylvania was injured. Petitioners' brief alleges further that the proprietary injury was "to the state's ability to discharge its duties and responsibilities toward its citizens." Brief of Petitioner at 6. At oral argument the additional point was raised that state tax revenues were reduced due to the inadequacy of the SBA loan funds
 
 
 [15]
 See Hawaii v. Standard Oil Co., 405 U.S. 251, 257-59, 92 S.Ct. 885, 888-89, 31 L.Ed.2d 184, 189 (1972); Georgia v. Pennsylvania R. R., 324 U.S. 439, 445-57, 65 S.Ct. 716, 720-26, 89 L.Ed. 1051, 1055 (1945)
 
 
 [16]
 397 U.S. 150, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184, 189 (1970)
 
 
 [17]
 15 U.S.C. §§ 631-51 (1970)
 
 
 [18]
 15 U.S.C. § 631 (1970)
 
 
 [19]
 See, e. g., 7 U.S.C. § 1926 (1970) (authorizing Secretary of Agriculture to grant or insure loans, for soil and water conservation purposes, to "public and quasi-public agencies")
 
 
 [20]
 See H.R.Rep.No.555, 85th Cong., 1st Sess. (1957); S.Rep. 1714, 85th Cong., 2d Sess. (1958); Conf.Rep. 2135, 85th Cong., 2d Sess. (1958); U.S.Code Cong. & Admin.News 1958, p. 3071
 
 
 [21]
 Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1365-1366, 31 L.Ed.2d 636, 642 (1972)
 
 
 [22]
 See Warth v. Seldin, 422 U.S. 490, 498-502, 95 S.Ct. 2197, 2204-2207, 45 L.Ed.2d 343, 354-356 (1975); Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 217, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706, 716 (1974); United States v. Richardson, 418 U.S. 166, 176-77, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678, 687 (1974); Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955-1956, 20 L.Ed.2d 947, 965 (1968)
 
 
 [23]
 See Flast v. Cohen, 392 U.S. 83, 103, 88 S.Ct. 1942, 1954, 20 L.Ed.2d 947, 963 (1968)
 
 
 [24]
 Hawaii v. Standard Oil Co., 405 U.S. 251, 257, 92 S.Ct. 885, 888, 31 L.Ed.2d 184, 189 (1972)
 
 
 [25]
 See, e. g., Pennsylvania v. West Virginia, 262 U.S. 553, 591, 43 S.Ct. 658, 663, 67 L.Ed. 1117, 1129 (1923); Missouri v. Illinois, 180 U.S. 208, 241, 21 S.Ct. 331, 343-348, 45 L.Ed. 497, 512 (1901)
 
 
 [26]
 See, e. g., Georgia v. Pennsylvania R. R., 324 U.S. 439, 445-46, 65 S.Ct. 716, 720-721, 89 L.Ed. 1051, 1055 (1945); Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038, 1044 (1907)
 
 
 [27]
 See, e. g., Washington Util. & Transp. Comm. v. FCC, 513 F.2d 1142 (9th Cir., cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); New York v. United States, 65 F.Supp. 856, 872 (N.D.N.Y.1946), aff'd, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947) (affirmed without discussion of standing issue)
 
 
 [28]
 See Mormon Church v. United States, 136 U.S. 1, 58, 10 S.Ct. 792, 808, 34 L.Ed. 478, 497 (1890)
 
 
 [29]
 Hawaii v. Standard Oil Co., 405 U.S. 251, 258-59, 92 S.Ct. 885, 889-890, 31 L.Ed.2d 184, 190 (1972); Note, State Protection of its Economy and Environment: Parens Patriae Suits for Damages, 6 Colum.J.L. & S.Prob. 411, 431 (1970)
 
 
 [30]
 State standing on an explicit parens patriae theory was first upheld by the Supreme Court in Missouri v. Illinois, 180 U.S. 208, 241, 21 S.Ct. 331, 343-344, 45 L.Ed. 497, 512 (1901). The theory had been considered a year earlier in Louisiana v. Texas, 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347, 354 (1900), where the unique facts of the case led the Court to a conclusion of no standing
 
 
 [31]
 Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038, 1044 (1907)
 
 
 [32]
 New Jersey v. New York, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931) (standing not discussed); North Dakota v. Minnesota, 263 U.S. 365, 373-74, 44 S.Ct. 138, 139, 68 L.Ed. 342, 345 (1923); Wyoming v. Colorado, 259 U.S. 419, 464, 42 S.Ct. 552, 557, 66 L.Ed. 999, 1013 (1922); Kansas v. Colorado, 206 U.S. 46, 99-100, 27 S.Ct. 655, 668, 51 L.Ed. 956, 975 (1907)
 
 
 [33]
 New York v. New Jersey, 256 U.S. 296, 301-02, 41 S.Ct. 492, 493-494, 65 L.Ed. 937, 940 (1921); Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038, 1044 (1907); Missouri v. Illinois, 200 U.S. 496, 26 S.Ct. 268, 50 L.Ed. 572 (1906) (standing not discussed); Missouri v. Illinois, 180 U.S. 208, 241, 21 S.Ct. 331, 343-344, 45 L.Ed. 497, 512 (1901)
 
 
 [34]
 Pennsylvania v. West Virginia, 262 U.S. 553, 591, 43 S.Ct. 658, 663, 67 L.Ed. 1117, 1129 (1923)
 
 
 [35]
 405 U.S. 251, 257-59, 92 S.Ct. 885, 888-889, 31 L.Ed.2d 184, 189 (1972). See Georgia v. Pennsylvania R. R., 324 U.S. 439, 447-48, 65 S.Ct. 716, 721, 89 L.Ed. 1051, 1057 (1945); Oklahoma ex rel. Johnson v. Cook, 304 U.S. 387, 393-94, 58 S.Ct. 954, 957, 82 L.Ed. 1416, 1419 (1938)
 
 
 [36]
 Georgia v. Pennsylvania R. R., 324 U.S. 439, 451, 65 S.Ct. 716, 723, 89 L.Ed. 1051, 1059 (1945) (requiring "an interest apart from that of particular individuals who may be affected"). See Oklahoma ex rel. Johnson v. Cook, 304 U.S. 387, 394, 58 S.Ct. 954, 957, 82 L.Ed. 1416, 1420 (1938); North Dakota v. Minnesota, 263 U.S. 365, 376, 44 S.Ct. 138, 140, 68 L.Ed. 342, 346 (1923); Oklahoma v. Atchison T. & S. F. Ry., 220 U.S. 277, 289, 31 S.Ct. 434, 437, 55 L.Ed. 465, 469 (1911); Louisiana v. Texas, 176 U.S. 1, 16, 20 S.Ct. 251, 256, 44 L.Ed. 347, 353 (1900); New Hampshire v. Louisiana, 108 U.S. 76, 90-91, 2 S.Ct. 176, 183, 27 L.Ed. 656, 661 (1883)
 The above cases do not present an isolated question of whether a state has standing to protect an interest in economic well-being. All were brought within the original jurisdiction of the Supreme Court, and thus involve the concern to shepherd the scarce time and resources of that tribunal. Those actions brought against states also raise important federalism issues. See Part II, B infra.
 
 
 [37]
 Oklahoma ex rel. Johnson v. Cook, 304 U.S. 387, 395-96, 58 S.Ct. 954, 958, 82 L.Ed. 1416, 1419 (1938) (contract action); North Dakota v. Minnesota, 263 U.S. 365, 375-76, 44 S.Ct. 138, 140, 68 L.Ed. 342, 346 (1923) (tort action); New Hampshire v. Louisiana, 108 U.S. 76, 91, 2 S.Ct. 176, 183, 27 L.Ed. 656, 661 (1883) (contract action)
 
 
 [38]
 Oklahoma v. Atchison, T & S. F. Ry. Co., 220 U.S. 277, 289, 31 S.Ct. 434, 437, 55 L.Ed. 465, 469 (1911) (no standing to seek injunction of unreasonable freight rates). See Georgia v. Pennsylvania R. R., 324 U.S. 439, 451-52, 65 S.Ct. 716, 723-724, 89 L.Ed. 1051, 1059 (1945) (finding state standing, but explicitly affirming Oklahoma v. Atchison, T & S. F. Ry. Co.)
 
 
 [39]
 Pennsylvania v. West Virginia, 262 U.S. 553, 564-65, 43 S.Ct. 658, 659, 67 L.Ed. 1117, 1124 (1923)
 
 
 [40]
 Hawaii v. Standard Oil Co., 405 U.S. 251, 258-59, 92 S.Ct. 885, 889-890, 31 L.Ed.2d 184, 190 (1972) (suggesting the existence of parens patriae standing to sue for damages under the antitrust laws, but finding no legal injury to the state under the statute); Georgia v. Pennsylvania R. R., 324 U.S. 439, 450-51, 65 S.Ct. 716, 722-723, 89 L.Ed. 1051 (1945) (finding parens patriae standing to seek injunction against discriminatory freight rates, though shippers are the class of persons most immediately injured)
 
 
 [41]
 It has been further suggested that the Court itself has not been consistent in its declaration of the nature of the requisite injury. See Comment, Standing of States to Represent the Interests of their Citizens in Federal Court, 21 Am.L.Rev. 224, 235 (1971); Note, Federal Jurisdiction Suits by a State as Parens Patriae, 48 N.C.L.Rev. 963, 968-69 (1970)
 
 
 [42]
 Parens patriae standing appears to be most justifiable in those instances where undeniable harm has been done, but for some reason the individual injuries are not legally recognizable. One instance of this arises in the case of interstate public nuisances. See Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907). The arguments in favor of allowing such standing become less compelling, as it becomes more feasible to achieve complete relief through suits by the parties actually aggrieved
 Wherever private actions for damages are a possibility, the threat of double recovery stands as a major obstacle to any state action for damages. Hawaii v. Standard Oil Co., 405 U.S. 251, 262-64, 92 S.Ct. 885, 891-892, 31 L.Ed.2d 184, 192 (1972).
 
 
 [43]
 But note that the policies impinging on the determination of standing will vary depending on the citizenship of the private defendant. Where a state seeks to sue a citizen of another state, the action comes within the original though non-exclusive jurisdiction of the Supreme Court. 28 U.S.C. § 1251(b)(3) (1970). In general, the fact that any case appears to fall within the original jurisdiction of the Supreme Court may incline the Court toward a finding of no standing, in order to conserve its scarce time and resources. While the Court has significant discretion to decline to hear cases falling within its original jurisdiction, see Ohio v. Wyandotte Chemicals Corp., 401 U.S. 493, 91 S.Ct. 1005, 28 L.Ed.2d 256 (1971), it may nonetheless wish to dismiss on the basis that standing is absent
 This consideration does not arise where a state seeks to sue its own citizen, since there is then no question of original jurisdiction.
 
 
 [44]
 E. g., New Jersey v. New York, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931); North Dakota v. Minnesota, 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342 (1923); Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); Wyoming v. Colorado, 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999 (1922); New York v. New Jersey, 256 U.S. 296, 4 S.Ct. 492, 65 L.Ed. 937 (1921); Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907); Missouri v. Illinois, 200 U.S. 496, 26 S.Ct. 268, 50 L.Ed. 572 (1906); Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 33, 45 L.Ed. 497 (1901)
 
 
 [45]
 See Rhode Island v. Massachusetts, 37 U.S. (12 Pet.) 657, 743, 9 L.Ed. 1233, 1268 (1838)
 
 
 [46]
 North Dakota v. Minnesota, 263 U.S. 365, 373, 44 S.Ct. 138, 139, 68 L.Ed. 342, 345 (1923); Kansas v. Colorado, 206 U.S. 46, 84, 27 S.Ct. 655, 661, 51 L.Ed. 956, 969 (1907); Missouri v. Illinois, 180 U.S. 208, 241, 21 S.Ct. 331, 343-344, 45 L.Ed. 497, 512 (1901)
 
 
 [47]
 Missouri v. Illinois, 180 U.S. 208, 241, 21 S.Ct. 331, 344, 45 L.Ed. 497, 512 (1901)
 48 U.S. Const. art. III, § 2.
 
 
 [49]
 28 U.S.C. § 1251(a)(1) (1970)
 
 
 [50]
 At the same time, under the Eleventh Amendment, the fact that the action is brought against a state gives added support to a holding of no standing where such standing already appears highly doubtful that is where the interests involved are essentially those of particular injured persons. See North Dakota v. Minnesota, 263 U.S. 365, 375-76, 44 S.Ct. 138, 139, 68 L.Ed. 342, 346 (1923)
 
 
 [51]
 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)
 
 
 [52]
 The Court begins its discussion with the statement that "(w)e need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress . . . ." 262 U.S. at 485, 43 S.Ct. 597 at 600, 67 L.Ed. at 1084. However, a few sentences later it asserts that, while a state may sometimes sue on behalf of its citizens, "it is no part of its duty or power to enforce their rights in respect of their relations with the federal government." Id. at 485-86, 43 S.Ct. at 600, 67 L.Ed. at 1084. This latter statement sounds like a flat denial of state parens patriae power in areas where federal power exists, and thus would bar any such suit against the Federal Government. See also dictum in Georgia v. Pennsylvania R.R., note 54 infra. We see no need to resolve this apparent ambiguity in the opinion, and will base our analysis on the narrower reading of the Mellon case
 
 
 [53]
 South Carolina v. Katzenbach, 383 U.S. 301, 324, 86 S.Ct. 803, 816, 15 L.Ed.2d 769, 784 (1966); Jones ex rel. Louisiana v. Bowles, 322 U.S. 707, 64 S.Ct. 1043, 88 L.Ed. 1551 (1944) (motion for leave to file complaint denied for lack of jurisdiction); Florida v. Mellon, 273 U.S. 12, 18, 47 S.Ct. 265, 266, 71 L.Ed. 511, 515 (1927); Minnesota ex rel. Lord v. Benson, 107 U.S.App.D.C. 106, 108, 274 F.2d 764, 766 (1960)
 
 
 [54]
 Georgia v. Pennsylvania R.R., 327 U.S. 439, 445-46, 65 S.Ct. 716, 721, 89 L.Ed. 1051, 1057 (1945). (". . . Massachusetts v. Mellon and State of Florida v. Mellon, supra, make plain that the United States, not the State, represents the citizens as parens patriae in their relations to the federal government.")
 
 
 [55]
 In the only case in which the Supreme Court has upheld state parens patriae standing to sue the Federal Government, the opinion of the Court did not discuss the standing question. The court proceeded directly to the merits and ruled against the plaintiff states. New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947). It is also noteworthy that the case involved a regional shifting of the ICC freight rate burden by reciprocal tariff increases and decreases, and that the Attorneys General of numerous states were represented on appeal to the Supreme Court, on both sides of the case. Thus, while the case was brought to challenge the action of a federal agency, it was, as a matter of interest, also a controversy between states, implicating the interest in settlement of interstate disputes. Id. at 288-289, 67 S.Ct. at 1210, 91 L.Ed. at 1501
 An argument for granting state parens patriae standing to challenge the Vietnam War was made by Justice Douglas in Massachusetts v. Laird, 400 U.S. 886, 887-91, 91 S.Ct. 128, 129-131, 27 L.Ed.2d 130, 131-132 (1970). However, that argument came in a dissent to denial of certiorari in which no other members of the Court joined. Further, while the opinion did assert that the holding of Massachusetts v. Mellon should be reexamined in light of the recent liberalization of standing doctrine, id. at 889, 91 S.Ct. at 130, 27 L.Ed.2d at 132, it also implicitly recognized some force in the federalism rationale of Mellon. Justice Douglas argued that the case before him differed from Mellon in posing a lesser intrusion on the federal parens patriae power. Unlike Mellon, which challenged an act of Congress signed by the Executive, the very gist of the suit then before them was that the Vietnam War was not, properly speaking, an action of the Federal Government, because it had never been explicitly endorsed by Congress. Id. at 888, 91 S.Ct. at 130, 27 L.Ed.2d at 132.
 At least two Courts of Appeals appear to have allowed states or territories to sue on a parens patriae basis. Most recently, the Ninth Circuit upheld, on parens patriae and proprietary grounds, the standing of a state utility commission to challenge an order of the FCC. Washington Utility and Transportation Comm'n v. FCC, 513 F.2d 1142 (9th Cir. 1975). That court, however, purported to recognize the continuing vitality of Mellon as a bar to state litigation of questions of distribution of powers between the State and the national government. Id. at 1153.
 Our own court in two instances has allowed territories of the United States to attack rate decisions of the Federal Maritime Commission. Guam v. FMC, 117 U.S.App.D.C. 296, 329 F.2d 251 (1964); Puerto Rico v. FMC, 110 U.S.App.D.C. 17, 288 F.2d 419 (1961) (no discussion of standing). It is not entirely clear that either of these cases rests on a parens patriae theory. Further, the only discussion of standing in either case reaffirms the continuing authority of Massachusetts v. Mellon and Minnesota ex rel. Lord v. Benson, 117 U.S.App.D.C. at 297, 329 F.2d at 252.
 Finally, there are a number of cases involving natural gas, in which states have been allowed to sue the Federal Power Commission. E.g., Wisconsin v. FPC, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954); California v. FPC, 111 U.S.App.D.C. 226, 296 F.2d 348 (1961), rev'd on other grounds, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). These cases raise no question of parens patriae standing, since the Natural Gas Act itself provides for state standing to challenge FPC orders concerning natural gas. 15 U.S.C. § 717d(a) (1970).
 
 
 [56]
 It has been suggested that the constitutional nature of the challenge in Massachusetts v. Mellon was a critical element in the outcome of that case, and that suits challenging only the construction or application of a federal statute should be distinguished from it on that basis. Washington Util. & Transp. Comm'n v. FCC, 513 F.2d 1142, 1153 (9th Cir. 1975)
 While, as a general proposition, it may be that non-constitutional challenges tend to be less disruptive than constitutional ones, which sometimes attack the legitimacy of an entire statute, there is no reason to suppose that this will always be true. Many constitutional challenges attack a statute not on its face, but as applied to a single set of facts, and in that respect are much like many non-constitutional actions. Further, the degree of interference and disruption occasioned by any suit is dependent on a variety of factors, and no single characteristic can logically be looked to as a basis for winnowing out the cases in which state standing should be granted.
 
 
 [57]
 See cases cited, notes 32, 33, 34 supra
 
 
 [58]
 It appears to us that virtually all of the interstate dispute cases cited by petitioners fall within this category, because they implicate traditional quasi-sovereign interests in use of interstate waters and freedom from interstate pollution. See cases cited notes 32, 33 supra. The only interstate suit in which the asserted parens patriae interest was more questionable, because arguably wholly derivative from individual interests, was Pennsylvania v. West Virginia, in which the state sued on behalf of the economic interests of its citizens. It is noteworthy in that case that the granting of parens patriae standing was not essential to the holding of the case, since the Court also recognized an independent proprietary interest in the state. 262 U.S. at 565, 43 S.Ct. at 659, 67 L.Ed. at 1124
 
 
 [59]
 Inasmuch as all of the physical injury involved in this case is injury to land and property caused by Hurricane Agnes, it may superficially appear that the action seeks vindication of some land-related quasi-sovereign interest of the state. The legal injury, however, has nothing to do with the hurricane's depredations, but relates instead to the alleged maladministration of the SBA relief effort. Thus in bringing suit, the state can not be said to seek relief from harm to some land-related quasi-sovereign interest of its own. See text accompanying note 31, supra
 
 
 [60]
 Brief of Petitioner at 3-4
 The Government states unequivocally, the contrary claims of appellant Pennsylvania being conclusory and unsupported by any allegations of fact, that the agency's disaster classification had no unfavorable results for Pennsylvania. It is agreed that the difference between A and B classification is that under the B classification, given to Hurricane Agnes here, the disaster is administered by the Regional Administrator, not from Washington. But the locus of the administrative designation and the scene of command for the relief expedition has nothing whatever to do with the amount of the effort exerted by the Federal Government; nor does such relief headquarters and class designation have anything to do with the measure of assistance from various localities which can be called upon by the Federal Government. For example, the Government tells us here that over 900 people were brought into Pennsylvania from other states. The administrator of the overall relief effort was sent from Washington to Pennsylvania to administer the relief effort on the scene. If the disaster had been designated Class A, then the same administrator would have remained in Washington, presumably the same 900 people could have been sent in, and we see no apparent probable difference in the result.
 Furthermore, on an overall review of the relative desirability of having relief efforts administered from Washington or from a command post sited locally, the Small Business Administration has concluded that it is almost invariably preferable to have the relief effort directed locally. Since 1972 all disaster areas had been administered in the way Class B disasters were administered previously, i. e., from the local scene, even though the chief relief administrator and outside help may have been sent from Washington.
 There is nothing in the statute which deals with either Class A or Class B areas. This administrative agency classification has been discarded since 1972, in effect, the Class B type administration having been determined to be more fruitful and the Class A administration from Washington abandoned. See note 3 supra.
 
 
 [61]
 It is commonly said that the merits of the case are not relevant in determining a party's standing to sue. E.g., Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975); Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829-830, 25 L.Ed.2d 184, 188 (1970). This generalized principle clearly does not bar analysis of the factors we have considered; the interest offended, the character of the injury, see Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975); and the presence of prudential considerations indicating that the plaintiff is not a proper representative of that interest against the defendant he has selected
 
 
 [62]
 See note 60 supra
 
 
 [63]
 See notes 52-55 and accompanying text, supra
 
 
 [64]
 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)
 
 
 [65]
 Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974)
 
 
 [66]
 Washington Util. & Transp. Comm'n v. FCC, 513 F.2d 1142 (9th Cir. 1975)
 
 
 [67]
 Arguably the case is distinguishable on the second ground that the court has found a proprietary as well as a parens patriae basis for standing. If this is true, the parens patriae basis may be non-essential to the court's holding. However, it is not clear from their discussion whether a separate proprietary interest exists, or whether the alleged proprietary interest is only the sort of quasi-sovereign interest that is necessary for a finding of parens patriae standing. See id. at 1149-52
 
 
 [68]
 It has also been suggested that utility cases raise specially compelling arguments in support of state standing. Guam v. FMC, 117 U.S.App.D.C. 296, 298, 329 F.2d 251, 253 (1964). We are unable to ascertain whether the standing granted in that case was on a proprietary or a parens patriae theory. In any event, by no stretch does the present case involve a utility, or a state utility regulating agency
 
 
 [1]
 Adherence to the Mellon doctrine has not been quite as unwavering as the majority opinion would suggest. In characterizing New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947) as "the only case in which the Supreme Court has upheld state parens patriae standing to sue the Federal Government," the court overlooks the decision in South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), in which, after relying upon Mellon to dismiss South Carolina's due process and bill of attainder attacks on the Voting Rights Act of 1965, the Supreme Court proceeded to consider without comment the merits of South Carolina's Fifteenth Amendment challenge. The Court's action was viewed by many as a significant erosion of the Mellon principle. See Bickel, "The Voting Rights Cases," 1966 Supreme Court Review 79
 Moreover, as the majority recognizes, this Circuit has in the past sustained the attack by territorial governments on rate decisions of the Federal Maritime Commission. Guam v. FMC, 117 U.S.App.D.C. 296, 329 F.2d 251 (1964). In Guam, the court distinguished Mellon on the ground that a rate challenge might be conceptually viewed as a controversy between the territory, as parens patriae, and private operators in which the federal government has simply been trapped as an intermediary, 329 F.2d at 252. This distinction, however, is disingenuous. Any utility rate approval or disapproval involves the most fundamental exercise of sovereignty in that it requires an identification and assessment of the public interest.