The **COMMONWEALTH OF PUERTO RICO, on the Relation of Carlos S. QUIROS, Secretary, Department of Labor and Human Resources, Plaintiff,**

v.

**ALFRED L. SNAPP & SON, INC., et al., Defendants.**

**Civ. A. No. 79–0007(H).**

United States District Court,
W. D. Virginia,
Harrisonburg Division.

April 19, 1979.

Luis Guinot, Jr., Robert C. Watson, Fairfax, Va., Charles S. Fax, Washington, D.C., for plaintiff.

Thomas J. Bacas, Charles, Karalekas & Bacas, Washington, D.C., William A. Johnston, Ronald J. Brown, Harrison & Johnston, Winchester, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

During the spring and summer of 1978, weather and climatic conditions combined to produce a record apple crop in the orchards along the eastern coast of the United States. This suit concerns the recruitment of workers to harvest that crop.

Stated briefly, a statutory and regulatory scheme has been established by the federal government to insure that domestic workers are given priority over foreign workers for employment opportunities within the United States. *See generally*, Wagner-Peyser Act, 29 U.S.C. § 49, *et seq.*; Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*; 20 C.F.R. Part 655; 8 C.F.R. § 214(h)(3). As the time for harvest draws near, the apple growers, as do other crop growers, avail themselves of this system, known as the United States Employment Service, to secure laborers to work the harvest. This service is, in fact, a national system of public employment offices. If workers cannot be found locally, the interstate facilities are utilized to locate available workers in the domestic labor market. For purposes of this service, Puerto Rican workers are considered to be part of the domestic labor force. 29 U.S.C. § 49b(b). If the demand for workers exceeds the domestic labor supply, the employers may petition the Secretary of Labor for a certificate of need for foreign labor, 8 C.F.R. § 214.2(h)(3), 20 C.F.R. Part 655, and, if granted, apply to the Attorney General for non-immigrant visas for persons to perform temporary labor. 8 U.S.C. § 1101(a)(15)(H)(ii); 8 U.S.C. § 1184(c).

Commencing in April, 1978, apple growers in New York, Maryland, Virginia, and West Virginia sought to secure seasonal labor for the late summer and early autumn apple harvest through the interstate clearance system. The implementation of this process, however, was to run a troubled, confused and turbulent course. Ultimately, on the day on which the brief harvest period was to begin, far fewer workers were in the orchards than were needed for the task. This situation posed the very real danger that certain varieties of apples would over-ripen on the trees, thereby greatly diminishing their commercial value. Shortly before the harvest was to begin, the apple growers of the several states filed suit in this court seeking a mandatory injunction against the United States Secretary of Labor, the Commissioner of the Immigration and Naturalization Service, and their subordinates, to permit the recruitment and employment of foreign workers. The Commonwealth of Puerto Rico was permitted to intervene on behalf of its citizens who allegedly would have been displaced by the employment of foreign workers. To insure that the harvest would be completed, this court entered a preliminary injunction ordering that a certain number of foreign workers be allowed to enter this country to pick the apples. *Frederick County Fruit Growers Association, Inc., et al. v. Marshall, et al.,*

Civ. Action No. 78–0086(H) (August 31, 1978), *appeal dismissed and remanded,* 594 F.2d 857 (4th Cir. 1979) (unpublished).

During the arguments preceding the entry of the preliminary injunction, it was represented to this court that the apple growers recognized their obligation to give priority in their hiring process to the Puerto Rican workers notwithstanding a court order permitting the employment of foreign workers. The primary thrust of the instant suit is the assertion by the Commonwealth of Puerto Rico, on the relation of Carlos S. Quiros, Secretary of the Department of Labor & Human Resources, that the Virginia apple growers failed to fulfill their acknowledged obligation.

The present action was commenced on January 11, 1979. The named defendants are numerous companies and individuals engaged in the apple industry, all of whom reside in Virginia. Jurisdiction is predicated upon 28 U.S.C. § 1331, and 28 U.S.C. § 1337. By its second amended complaint, plaintiff alleges that each defendant filed a clearance order with the Virginia Employment Commission, an agency associated with the Federal Employment Service System, containing job orders for a specified number of unskilled agricultural laborers. The Puerto Rico Employment Service, another member of the interstate clearance system, received job offers from *all* east coast apple growers totalling 2,318. By August 14, 1978, plaintiff allegedly had recruited 1,094 Puerto Rican workers and thereafter continued its recruitment process until a sufficient number of workers were obtained to satisfy the job orders. Of the 2,318 Puerto Rican workers recruited by plaintiff, only 992 such workers were transported to the mainland, allegedly because of oral advice received from the United States Department of Labor to the effect that the growers had refused to employ those Puerto Rican workers who had arrived previously. The Virginian growers who are defendants here are alleged to have made commitments to employ 787 Puerto Rican workers although only 420 workers arrived in the Virginian orchards as a result of the Labor Department's warning. Within three weeks of their arrival, fewer than 30 remained employed. It is alleged that the remainder were either unable to secure the promised employment or, if employed, were dismissed for lack of productivity or picking damaged fruit. Plaintiffs also allege that the Puerto Rican workers were subjected to less favorable working conditions than the Jamaicans who had been recruited pursuant to the court order. Such discrimination allegedly benefited the productivity of the Jamaican workers to the detriment of that of the Puerto Ricans. For the alleged failure to employ, unequal treatment, and improper termination, plaintiff seeks a declaration that defendants' actions were in violation of the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.,* the Immigration and Nationality Act of 1952. 8 U.S.C. § 1101 *et seq.,* as amended, and the regulations promulgated under each, and a permanent injunction to enjoin any future violation of the same.

On February 15, 1979, defendants filed a motion to dismiss asserting, *inter alia,* that plaintiff lacked standing to bring this action. After all briefs were submitted, the court heard oral argument on March 7, 1979. After a careful evaluation of the facts alleged in the complaint in light of the evolution of the doctrine of *parens patriae* standing, the court is of the opinion that the motion is well taken and that dismissal of the complaint is required.

◼ The concept of *parens patriae* standing is a rather elusive one which does not lend itself to precise definition. As a preliminary matter, it should be distinguished from those instances where a state seeks to redress an injury sustained in its proprietary capacity, as where a state sues as an injured consumer. *See, e. g. Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Before assessing the merits of the instant case, three observations should be made regarding the present posture of this case. First, the Commonwealth brings this suit solely in its capacity as *parens patriae.* No separate proprietary interest in this litigation has been asserted. At best, any such interest

would be predicated necessarily upon the harm to the general economy, the consequential reduction in state revenues, and the increased payment of public benefits. Taken to its logical conclusion, this proposition would permit a state to challenge any business or governmental decision which would adversely affected its economy. The connection between this proprietary concern of the state and the alleged wrong is too attenuated to be cognizable for purposes of standing. *Pennsylvania ex rel. Shapp v. Kleppe*, 174 U.S.App.D.C. 441, 445, 533 F.2d 668, 672 (1976). Rather, redress for these wrongs must be sought in the role of *parens patriae.* Second, if *parens patriae* standing is appropriate, the Commonwealth of Puerto Rico is an entity capable of asserting that interest. *Commonwealth of Puerto Rico v. S.S. Zoe Calocotroni*, 456 F.Supp. 1327 (D.P.R.1978); *compare City of Hartford v. Towns of Glastonbury*, 561 F.2d 1032 (2d Cir. 1976); *Board of Supervisors of Fairfax County, Virginia v. United States*, 408 F.Supp. 556 (E.D.Va.1976), *appeal dismissed* 551 F.2d 305 (4th Cir. 1977). Finally, plaintiff seeks only declaratory and injunctive relief. Thus, the court is spared the necessity of wrestling with the thorny problems inherent in *parens patriae* damage actions. *See generally, Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (anti-trust damages); *California v. Frito-Lay, Inc.*, 474 F.2d 774 (9th Cir.), *cert. denied* 412 U.S. 908, 93 S.Ct. 2291, 36 L.Ed.2d 974 (1973) (class action); *West Virginia v. Chas. Pfizer and Co.*, 440 F.2d 1079 (2d Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971) (class action); *In re Motor Vehicle Air Pollution Control Equipment*, 52 F.R.D. 398 (C.D.Cal.1970), *cert. denied* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973) (class action); *In re Montgomery County Real Estate Litigation*, 452 F.Supp. 54 (D.Md.1978); *Note, State Protection of its Economy and Environment: Parens Patria Suits for Damages*, 6 Columbia J.L. & Soc.Prob. 411 (1970).

■■ As in all other cases where the standing of a party to bring suit is in issue, the court is called upon to determine whether the plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). No one could challenge the sincerity with which the Commonwealth now seeks to vindicate the interests of its citizens. The essential "concrete adverseness" being assured as a practical matter, the court nevertheless must inquire further to insure that a state has alleged more than "a mere 'interest in a problem.'" *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). A state cannot, of course, volunteer to litigate a collection of the private claims of its citizens merely because it expresses an interest in doing so. *Pennsylvania v. New Jersey*, 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976); *New Hampshire v. Louisiana*, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883). To satisfy the threshold jurisdictional requirement, a sovereign entity seeking to act in the capacity of *parens patriae* must assert a "quasi-sovereign" interest. *Hawaii v. Standard Oil Co., supra.* Whether such an interest has been stated depends essentially upon the type of interest asserted and the magnitude of the harm involved.

■ A quasi-sovereign interest has been defined variously as "an interest independent of and behind the titles of its citizens," *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907), and as "an interest apart from that of the individuals affected," *Pennsylvania v. West Virginia*, 262 U.S. 553, 592, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923). Thus, the sovereign interests implicated in the litigation must be sufficiently independent of the interests of the individual citizens to justify state *parens patriae* standing; the injuries to the state and the citizens need not, and usually cannot, be wholly independent. *Note, State Protection of Its Economy and Environment: Parens Patriae Suits for Damages, supra.* Derived from the

original power of the King to act as "parent of the country" for the protection of those unable to act for themselves, the traditional concept of a quasi-sovereign interest has been expanded during this century to reach issues involving the health, safety, and welfare of the state's residents. *Hawaii v. Standard Oil Co., supra.* Today, a state may bring suit to protect the public interest so long as that interest is not so vague and remote as to appear ethereal. *Compare Kelley v. Carr*, 442 F.Supp. 346 (W.D.Mich. 1977) *with Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center*, 356 F.Supp. 500 (E.D.Pa.1973).

The quasi-sovereign interest in the present case arises from the interest of the Commonwealth in the health of its general economy. It is clear that Puerto Rico has been plagued with seriously high levels of unemployment. During September, 1978, 18.5% of the adults in the labor market were unemployed. The problem was even worse in the rural areas where the unemployment figure reached 23%. Plaintiff argues that the challenged activities of defendant served to frustrate its efforts to obtain greater employment opportunities for its citizens. As a consequence, the expansion of the supply of money in circulation was less than it otherwise would have been, fewer tax revenues were gathered, and additional public benefits were required to be expended. The Commonwealth also asserts an interest in the proper application of federal laws which mandate a preference for Puerto Rican workers over foreign workers. Non-compliance with these laws serves to exacerbate the already serious employment problem present on the island. Thus stated, plaintiff has alleged an interest in the protection and preservation of its general economy, an interest which clearly implicates its quasi-sovereign capacity. *Georgia v. Pennsylvania Railroad Co., et al.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051

(1945); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923).

Once the quasi-sovereign interest has been identified, it must be assessed against the backdrop of the development of the *parens patriae* doctrine.[1] An analysis of the principal decisions which sketch the nebulous perimeter of the theory discloses three crucial factors which influence the decision to grant or deny standing: the size of the segment of the population that has been adversely affected, the magnitude of the harm inflicted, and the practical ability of those injured to obtain complete relief.

Since the propriety of this expanded motion of *parens patriae* standing was recognized in *Louisiana v. Texas*, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900), it has been emphasized that the State must be seeking to represent a significant portion of its populace. In *Louisiana v. Texas, supra* and *Oklahoma v. Atchison, Topeka and Santa Fe Railway Co.*, 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911), the Court noted that original jurisdiction was absent when the suit by the State was for the vindication of the grievances of particular individuals. Consistent with this thesis, *parens patriae* standing has been denied whenever the litigation was intended to benefit the individual interests of a narrow class of citizens, such as a particular industry. *Oklahoma v. Atchison, Topeka and Santa Fe Railway Co., supra* (freight shippers); *Jones ex rel. Louisiana v. Bowles*, 322 U.S. 707, 64 S.Ct. 1043, 88 L.Ed. 1551 (1944) (strawberry industry); *accord: Land O'Lakes Creameries, Inc. v. Louisiana State Board of Health*, 160 F.Supp. 387 (E.D.La.1958) (dried milk manufacturers); *but see Louisiana v. Weinberger*, 404 F.Supp. 894 (E.D.La.1975) (turtle industry). Nor may a state undertake to represent a mere collectivity of purely personal claims. *Pennsylvania v. New Jersey*,

---

1. Although many of the decisions which developed the *parens patriae* doctrine dealt primarily with questions of the original jurisdiction of the Supreme Court pursuant to Article III § 2 of the United States Constitution, they do provide precedential value in the case at bar. *Hawaii v. Standard Oil Co., supra.* Similarly, the principles of these cases are applicable notwithstanding the Eleventh Amendment considerations which appear in some of the cases. *Pennsylvania v. National Association of Flood Insurers*, 520 F.2d 11, 22–33 n. 26 (3rd Cir. 1975).

*supra* (tax claims); *Oklahoma ex rel. Johnson v. Cook*, 304 U.S. 387, 58 S.Ct. 954, 82 L.Ed. 1416 (1938) (creditors and depositors of a state bank); *New Hampshire v. Louisiana*, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883) (bond holders). In contrast to these cases are those where a substantial segment of the States citizens has a deep concern with the success of the litigation, e. g. *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923). In *Missouri v. Illinois, supra*, an artificial canal had been constructed to allow the sewerage of the City of Chicago to flow into the Mississippi River. Faced with an alarming increase in the rate of mortality from typhoid fever and other contagious diseases as a result of the pollution of the river, the State of Missouri sought to enjoin the discharge of sewerage. The Court noted that not only would the large communities located on the river be affected, but the economic repercussions would "injuriously affect the entire state." Id. at 241, 21 S.Ct. 331.[2] Some twenty years later, the Court was called upon to decide whether West Virginia, then the largest domestic producer of natural gas, could enact legislation which would severely curtail the flow of natural gas into Ohio and Pennsylvania. *Pennsylvania v. West Virginia, supra*. It was represented to the Court that approximately 1,500,000 citizens of Pennsylvania and 3,625,000 citizens of Ohio were dependent upon the natural gas produced in West Virginia. *Id.* at 590, 43 S.Ct. 658. Finding, that the affected consumers constituted a "significant portion of the State's population," *Id.* at 592, 43 S.Ct. at 663, the Court permitted the action to proceed to judgment. Thus, once the segment of the population adversely affected by the challenged activity approaches proportions which could be considered "significant", the public interest transcends the interest of the individual citizens, thereby allowing the state to seek to vindicate the broader cause.

Consideration must also be given to the magnitude of the harm which is caused or threatened to be caused by the asserted wrong. The proposed termination of natural gas supplies in *Pennsylvania v. West Virginia, supra* would have clearly led to a substantial disruption of the local economies of Ohio and Pennsylvania. An impact of similar dimensions was alleged in *Georgia v. Pennsylvania Railroad Co., et al.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) when Georgia complained that the twenty defendant railroad companies had conspired to fix non-competitive rates and charges for the transportation of freight. As a result, Georgia alleged that its economy was in a state of arrested development, its measures to diversify frustrated, and its access to the national market restricted. *Id.* at 444, 65 S.Ct. 716. Georgia was also considered to be the proper party plaintiff when it sought to enjoin the discharge of noxious gas which had caused the wholesale destruction of forests, orchards, and crops in a five county area. *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907). Even where the direct injury falls upon a relatively narrow class of persons, a state may still be allowed to proceed with the action if there are substantial generalized economic effects. *See Hawaii v. Standard Oil Co., supra; Pennsylvania ex rel. Shapp v. Kleppe, supra.* The Court must therefore determine whether the adverse conditions flowing from the challenged conduct are sufficiently severe and widespread as to constitute a wrong against the public interest.

Lastly, the ability of a state to represent its citizens is dependent in part on the presence or absence of other potential or actual plaintiffs who could obtain substantially similar relief. This consideration stems from the observation made by the Court in *Missouri v. Illinois, supra* that individual suits for personal injuries would provide "wholly inadequate and disproportionate remedies" in light of the grave threat to the health of the state posed by the sewerage discharge. *Id.* at 241, 21 S.Ct. 331. Since that time, the Court has consistently denied

---

2. Missouri eventually prevailed in this litigation and the discharge of sewerage into the Mississippi River was enjoined. *Missouri v. Illinois*, 200 U.S. 496, 26 S.Ct. 268, 50 L.Ed. 572 (1906).

*parens patriae* states to state plaintiff's whenever it appeared that the individual citizens were capable of maintaining and prosecuting their own actions for relief. *Pennsylvania v. New Jersey, supra; Hawaii v. Standard Oil Co., supra; see also New Hampshire v. Louisiana*, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883). The need for state representation in those instances being obviated, it then becomes apparent that the state plaintiff is attempting to vindicate a collection of private interests rather than its own quasi-sovereign interest.

Having contrasted the allegations in the instant complaint against this background, the court is of the opinion that the Commonwealth may not proceed as *parens patriae*. In sheer numbers alone, it is clear that relatively few residents of Puerto Rico were harmed directly by the alleged activities of defendants. At best, only 787 persons out of a total population of 2,712,033 [3] were so effected. This segment of the population falls far below the "substantial majority" suggested by some courts. *Pennsylvania ex rel. Shapp v. Kleppe, supra*, 174 U.S.App.D.C. at 448, 533 F.2d at 675. It must also be noted that the jobs which are the subject of this litigation were temporary in nature with a maximum duration of approximately two months. Given these facts, it is apparent that the impact of the alleged wrongs upon the general economy of Puerto Rico was relatively slight and that any harm which might have ensued was neither sufficiently severe nor generalized to permit the Commonwealth to take up the cause.

Plaintiff maintains that the Secretary of the Department of Labor and Human Resources has been charged with a statutory duty to protect the rights of the Puerto Rican migrant workers, 3 Pub.L. 87, as amended, and that such authority empowers the Secretary to represent their interests in this action. The Commonwealth informed this court that it intends to use this power vigorously to protect its migrant workers involved in the harvest of other crops as well. While a state would be precluded from commencing an action absent such authority, a statutory enactment cannot, in and of itself, confer Article III standing upon a state plaintiff to sue in the federal courts. *Land O'Lakes Creameries v. Louisiana State Board of Health*, 160 F.Supp. 387 (E.D.La.1958). The premise on which the Commonwealth proceeds is, of course, that the individual victims are unable as a practical or realistic matter to represent their own interests effectively. Despite this pessimism, these "[p]rivate citizens are not as powerless, however, as the State suggests." *Hawaii v. Standard Oil Co., supra*, 405 U.S. at 265, 92 S.Ct. at 893. It has been represented to the court by counsel for both parties that numerous individual law suits, as well as a broad based class action suit, have been filed in the Puerto Rican and federal courts by some of the displaced workers against some of the growers, including several who are defendants herein. Should the plaintiffs in those actions prevail on the merits, no greater relief could be obtained from this court. Since those most directly affected stand ready and willing to vindicate their own rights, the imperative for state intervention is absent. The court can detect no valid purpose to be served by allowing this action to proceed when the fundamental issues are already being litigated elsewhere.

To reiterate, the court finds that the allegations in the complaint fail to present a justiciable quasi-sovereign interest. Neither the segment of the population nor the injury to the Puerto Rican economy is of sufficient magnitude to permit this court to grant *parens patriae* standing. On balance, the private interests of the victimized class appear to predominate over the alleged broader public interest and, in fact, are being actively pursued in other judicial forums. This private litigation renders the efforts of the Commonwealth gratuitous and empty. The issue here is not one of sincerity of motive. Rather, it is one of practical judicial administration. When the asserted public interest is, upon closer in-

---

**3.** 1970 census as contained in the *World Almanac and Book of Facts* (1978).

spection, relatively narrow in scope, a court must question the propriety of *parens patriae* standing. Given the particular circumstances of this case, the court is constrained to hold that the Commonwealth is not entitled to proceed in that capacity. An appropriate order will this day be entered.