632 F.2d 365
 The COMMONWEALTH OF PUERTO RICO on the Relation of Carlos S.
QUIROS, Secretary, Department of Labor and Human
Resources, Appellants,
v.
ALFRED L. SNAPP & SONS, INC.; Alfred L. Snapp, Sr., Chief
Officer; John T. Watt& Son, a corporation d/b/a Timber Ridge
Fruit Farm; John T. Watt, Jr., Manager; Orchard Management
Co., Inc.; Harry F. Byrd, III, President-Treasurer; D. K.
Russell & Sons, Inc.; J. Robert Russell, President; Whitman
Orchards, a corporation; Gordon T. Whitman, President;
Robert Boyd, a corporation t/a Cloverdale Farm; Robert J.
Boyd, President-Treasurer; The C. L. Robinson Corporation;
Delmar Robinson, Jr., President; R & T Packing Corporation;
C. Robert Solenberger, President; E. Blackburn Moore; Fred
L. Glaize, Jr. & Philip B. Glaize d/b/a Cresent Orchards;
Frederick Farms; James R. Robinson, Manager; George B.
Whitacre; H. F. Byrd& T. B. Byrd; John E. Crumpacker,
Manager; H. F. Byrd; Harvey Brumback; James Clevenger;
McDonald Farms; Messick & Beaver; James Beaver; Frank L.
Snapp & Elmer G. Snapp d/b/a H. T. Snapp & Son; Frank L.
Snapp; Elmer G. Snapp; R. Roland Snapp; Robert E. Wyatt;
Stanley Bauserman; Stewart Bell; Woodside Farm; John W.
Smith; William S. Franklin; Wayne S. McInturff; James B.
Swing; George Cather; Garland R. Cather; Irvin R. King;
Albert W. Messick; C. H. Orchards, Appellees.
 No. 79-1349.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 8, 1980.
Decided Oct. 9, 1980.
 
 Paul A. Lenzini, Washington, D. C. (Luis Guinot, Charles S. Fax, Lynda R. Troutman, Washington, D. C., on brief) for appellant.
 S. Steven Karalekas, Arlington, Va. (Thomas J. Bacas, Charles, Karalekas & Bacas, Washington, D.C., William A. Johnson, Harrison & Johnston, Winchester, Va., on brief), for appellees.
 Before BUTZNER, HALL and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 This is an appeal by the Commonwealth of Puerto Rico[1] from an order of the district court dismissing its complaint against a number of apple growers in the State of Virginia. The district court held that Puerto Rico lacks standing under the doctrine of parens patriae to maintain this action.
 
 
 2
 There are fifty-two defendants, all engaged in the business of growing apples in Virginia (the Growers). The complaint alleged that the Growers violated laws of the United States which prefer domestic laborers (citizens of the United States) over foreign temporary laborers. It also alleged that the Growers violated their agreements to hire Puerto Rican farm workers, and discriminated against those who were hired in favor of Jamaican farm workers. The complaint sought a declaration of the rights of Puerto Rican citizens under the Wagner-Peyser Act of 1933, 29 U.S.C. §§ 49-49k as partially implemented by the Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq. and the Temporary Foreign Labor Certification Regulations, 20 C.F.R. §§ 655.0 et seq. Puerto Rico alleged irreparable injury to its citizens and sought to enjoin the Growers from future violations of these federal laws.
 
 
 3
 The Growers, assigning a number of grounds, moved for dismissal of the complaint. The trial court granted the motion to dismiss on one ground only-that Puerto Rico failed to present a justiciable quasi-sovereign interest and, therefore, lacked standing under the doctrine of parens patriae. This is the sole issue on appeal.
 
 
 4
 There was a record apple crop in the orchards along the eastern coast of the United States in 1978. This generated heavy activity to recruit temporary farm workers to pick the apples. The recruiting efforts, however, were not unique to 1978, nor to the eastern coastal area of the country. The phenomenon of recruiting temporary farm workers has produced both benefits and problems for those involved for a considerable number of years.
 
 
 5
 Congress has created a strong preference favoring domestic workers. It enacted the Wagner-Peyser Act in 1933 to facilitate the flow of labor from supply states to demand states during that period of depression and high unemployment. This Act, among other things, established the interstate clearance system administered by the United States Department of Labor. Employers transmit their job offers to units of the system in this case the Puerto Rican Employment Service. To complement the Wagner-Peyser Act, Congress amended the Immigration and Nationality Act, prohibiting the entry of aliens as temporary laborers as long as capable United States workers are available. Only if the demand for workers exceeds the domestic labor supply may employers petition the Secretary of Labor for certificates of need for foreign labor. Puerto Rican workers, of course, are part of the domestic labor force.
 
 
 6
 I. We must, in considering the correctness of a ruling on a Fed.R.Civ.P. 12(b) motion, accept as true all material allegations of the complaint. Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). So construed, the complaint reflects the following facts. Puerto Rico, in 1978, had a record rate of unemployment conservatively estimated at 23% in the rural areas and 18.5% throughout the Commonwealth. It took a number of steps to alleviate this condition. It made a concerted effort to place Puerto Rican workers with mainland apple growers, including the defendants. The Puerto Rican Employment Service, in response to requests for Puerto Rican workers made through the interstate clearance system in 1978, recruited 2,318 workers. Nine hundred ninety-two of these workers were dispatched to mainland United States. The Puerto Rican Employment Service was then advised, however, to prohibit the remainder from departing Puerto Rico, because the Growers were refusing to employ Puerto Rican workers when they appeared at their orchards.
 
 
 7
 Concurrently with this sequence of events, apple growers in several states filed a suit in 1978 in the district court for the Western District of Virginia. Frederick County Fruit Growers Association, Inc. v. Marshall, Civ. Action No. 78-0086(H) (August 31, 1978), appeal dismissed and remanded, 594 F.2d 857 (4th Cir. 1979) (unpublished). That action is not involved in this appeal but is part of the background helpful to understanding the single issue presented here. In that injunction action against the United States Secretary of Labor and the Commissioner of Immigration and Naturalization Service, the apple growers sought to recruit and employ foreign workers. The district court granted a preliminary injunction forcing the issuance of visas for foreign workers in order to ensure the harvesting of an undamaged apple crop. Puerto Rican workers thereafter appearing at the orchard gates were either denied employment or were subsequently terminated from their employment prior to the expiration of their contracts.
 
 
 8
 II. The prosecution of parens patriae actions by a state on behalf of its citizens is a practice long embedded in Anglo-American law, Louisiana v. Texas, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900), which has been expanded in this century, Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). In order to assert such standing, however, a state must act pursuant to a "quasi-sovereign" interest. Hawaii v. Standard Oil Co., supra; Georgia v. Pennsylvania Railroad Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907). There is no specific term of art defining a "quasi-sovereign" interest. In Georgia v. Tennessee Copper Co., 206 U.S. at 237, 27 S.Ct. at 619, the Supreme Court defined it as "an interest independent of and behind the titles of its citizens." In Pennsylvania v. West Virginia, 262 U.S. at 592, 43 S.Ct. at 663, it was said to be "an interest apart from that of the individuals affected."
 
 
 9
 These traditional concepts of quasi-sovereign interests have not changed over the years except to accommodate expanding judicial roles. The modern approach recognizes as appropriate a quasi-sovereign state action involving the health, safety and welfare of its citizens. Commonwealth of Pennsylvania by Shapp v. Kleppe, 533 F.2d 668 (D.C.Cir.1976). An interest in the general economy of the state is sufficient to base an action brought by a state in its quasi-sovereign capacity. Georgia v. Pennsylvania Railroad Co., supra. As the role of state government has expanded, more diverse "protectable" interests have been recognized. See, e. g., Kelley v. Carr, 442 F.Supp. 346 (W.D.Mich.1977); Commonwealth of Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center, 356 F.Supp. 500 (E.D.Pa.1973).
 
 
 10
 In Georgia v. Pennsylvania Railroad Co., supra, the Supreme Court permitted Georgia to sue parens patriae to outlaw discriminatory railroad freight rates. The Supreme Court said:
 
 
 11
 (D)iscriminatory rates fastened on a region have a more permanent and insidious quality. Georgia as a representative of the public is complaining of a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected. Georgia's interest is not remote; it is immediate. If we denied Georgia as parens patriae the right to invoke the original jurisdiction of the Court in a matter of that gravity, we would whittle the concept of justiciability down to the stature of minor or conventional controversies. There is no warrant for such a restriction.
 
 
 12
 324 U.S. at 451, 65 S.Ct. at 723.
 
 
 13
 The complexities of modern government make it impossible to catalogue the economic interests which can be protected by the sovereign as parens patriae. As the United States Court of Appeals for the District of Columbia Circuit has said:
 
 
 14
 The nature of the economic or welfare interest necessary to justify state standing is one of the more obscure issues with which we must deal. The valid though largely unhelpful generality which guides us is that the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens.
 
 
 15
 . . . .
 
 
 16
 ... (E)ven where the most direct injury is to a fairly narrow class of persons, there is precedent for finding state standing on the basis of substantial generalized economic effects (footnotes omitted).
 
 
 17
 Pennsylvania v. Kleppe, 533 F.2d at 674-75.
 
 
 18
 Three factors normally determine whether the quasi-sovereign interest is sufficiently important to permit standing: the size of the segment of the population that has been adversely affected, the magnitude of the harm inflicted, and the practical ability of those injured to obtain complete relief without intervention by the sovereign. Pennsylvania v. Kleppe, supra.
 
 
 19
 The decisions have generally agreed that a substantial proportion of the population of the sovereign must be affected in order that the sovereign may represent them in a parens patriae capacity. There has been no attempt, however, to reduce this requirement to an exact definition. For example, in Pennsylvania v. West Virginia, supra, the economic interest considered involved virtually every citizen of Ohio and Pennsylvania. In other cases, the Supreme Court has indicated that a state is just as legitimately concerned in its quasi-sovereign capacity when a substantial interest of an area smaller than the entire state is affected. Hawaii v. Standard Oil Co., supra; Georgia v. Tennessee Copper Co., supra; Pennsylvania v. Kleppe, supra.
 
 
 20
 While a state in its parens patriae capacity obviously cannot maintain a suit to redress simple injuries to private citizens, Oklahoma v. Atchison, Topeka & Santa Fe Railroad Co., 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911); Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed 497 (1901); Pennsylvania v. Kleppe, supra; Land O'Lakes Creameries, Inc. v. Louisiana State Board of Health, 160 F.Supp. 387 (E.D.La.1958), the fact that some of the citizens of the sovereign may be benefitted and others not affected by the suit, is not necessarily determinative. Any such suit will benefit some citizens of a state more than others.
 
 
 21
 The district court in the instant case held that "(n)either the segment of the population nor the injury to the Puerto Rican economy is of sufficient magnitude to permit this court to grant parens patriae standing." We disagree.
 
 
 22
 Puerto Rico as a commonwealth of the United States may, of course, represent its citizens if appropriate quasi-sovereign interests are involved. Commonwealth of Puerto Rico v. S. S. Zoe Colocotroni, 456 F.Supp. 1327 (D.P.R.1978).
 
 
 23
 The Puerto Rico Department of Labor is charged by law to encourage and develop the interest and welfare of the laborers of Puerto Rico, to improve their working conditions and to promote their opportunities to obtain profitable employment. P.R.Laws Ann. tit. 3 §§ 305-06 (1965). It has brought this suit in furtherance of its efforts in this regard. Puerto Rico has an unemployment problem of the gravest dimensions. The United States government, in the midst of a devastating depression in 1933, was faced with the same problems in all of its states and territories, and as one of the many efforts to combat that depression, enacted the Wagner-Peyser Act. The continued utilization of this legislation throughout the years is not in itself a consideration in determining standing in this case. Puerto Rico's 23% rural unemployment, however, approaches the economic devastation generally rampant in the United States at the time Wagner-Peyser was enacted. This is significant.
 
 
 24
 Puerto Rico's effort to strengthen its economy and to provide its citizens a way of life comparable to mainland standards must be viewed from a clear perspective. The number of farm workers temporarily employed annually does not accurately measure the potential effect of the damaged recruitment efforts on all of Puerto Rico's citizens. The island's officials are coping with an almost unmanageable unemployment problem. Its economy is in dire straits. The morale of the average Puerto Rican citizen under the circumstances can be expected to be extremely low. Deliberate efforts to stigmatize the labor force as inferior carry a universal sting.
 
 
 25
 The Puerto Rican government as an integral political subdivision relies on federal laws to help solve the problems of labor supply and demand. The apparent inability of the United States government, through the Department of Labor, to grant Puerto Ricans equal treatment with other citizens or even with foreign temporary workers must certainly have an effect which permeates the entire island of Puerto Rico. Residual injuries to the Commonwealth effort are, to say the least, very serious.
 
 
 26
 Although a parens patriae representation requires that a substantial portion of the citizens of the sovereign be affected, this requirement is satisfied whether they are affected directly or whether they are indirectly affected. There has never been cast a hard and fast game of numbers.[2] Parens patriae standing is appropriate where a sovereign seeks to protect a vital aspect of the general welfare of a substantial portion of its citizenry from serious, harmful, offensive conduct. It is the magnitude and the pervasiveness of the societal harm that must be weighed-not the directness of the injury to particular individuals.
 
 
 27
 The Growers contend that suits by individual workers will better achieve the results intended by the instant parens patriae action. We are not persuaded. The complaint alleges irreparable harm to future workers and to citizens in Puerto Rico who do not intend to migrate. Migrant farm workers are so destitute that they must leave their homes for two or three months each year to seek employment. It cannot be said with any assurance that they are in positions to litigate these issues effectively. They would, at best, achieve a piecemeal solution of Puerto Rico's parens patriae grievances and in the process wastefully consume judicial resources.
 
 
 28
 We, of course, do not pass on the merits of the complaint. There is nothing in the record to indicate the truth or falsity of the allegations. We only hold that Puerto Rico has standing to maintain this action in a parens patriae capacity.
 
 
 29
 Reversed and remanded for actions consistent with the opinions expressed in this decision.
 
 
 30
 REVERSED AND REMANDED.
 
 K. K. HALL, Circuit Judge, dissenting:
 
 31
 I do not agree with the result reached by the majority which permits the Commonwealth of Puerto Rico to proceed in this litigation as parens patriae. Admittedly, the issue in the context of this appeal presents a very close question. Nevertheless, I am satisfied that the district court acted within the guidelines set forth in Commonwealth of Pennsylvania by Shapp v. Kleppe, 533 F.2d 668 (D.C.Cir.1976), and properly considered the number of people affected by the Growers' alleged activities, the potential economic impact, and the ability of the workers to litigate their own claims. Accordingly, I would affirm the dismissal of the complaint.
 
 
 
 [1]
 On the relation of its Secretary of Labor and Human Resources
 
 
 [2]
 Most of the Pennsylvania and Ohio citizens in Pennsylvania v. West Virginia, supra, were directly affected in their economic well-being. Only some of the citizens of Georgia were directly affected by the noxious fumes in Georgia v. Tennessee Copper Co., supra. Most of the Georgia citizenry were only indirectly affected by the improper rate-fixing practices in Georgia v. Pennsylvania Railroad Co., supra