The COMMONWEALTH OF PUERTO RICO on the Relation of Carlos S. QUIROS, Secretary, Department of Labor and Human Resources, Plaintiff-Appellant,

v.

Louis BRAMKAMP, et al., Defendants-Appellees.

No. 724, Docket 79-7777.

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1981.

Decided July 28, 1981.

Paul A. Lenzini, Washington, D. C. (Luis Guinot, Jr., Charles S. Fax, and Lynda Troutman O'Sullivan, Washington, D. C. and Harry H. Wise, New York City, on the brief), for plaintiff-appellant.

Thomas F. Bacas, Washington, D. C. (S. Steven Karalekas and Charles, Karalekas, Bacas & McCahill, Washington, D. C., J. Kevin McKay and Hays, St. John, Abramson & Heilbron, New York City, for defendants-appellees.

T. Timothy Ryan, Jr., Sol. of Labor, Nathaniel Baccus, III, Assoc. Sol., Lois G. Williams, Deputy Assoc. Sol., Ruth E. Peters and Harry L. Sheinfeld, Washington, D. C., submitted a brief for the Secretary of Labor, amicus curiae.

Before FEINBERG, Chief Judge, NEWMAN, Circuit Judge, and MISHLER,* District Judge.

* Honorable Jacob Mishler, Senior United States District Judge, Eastern District of New York, sitting by designation.

MISHLER, District Judge:

On January 12, 1979 the Commonwealth of Puerto Rico filed a complaint in the United States District Court for the Southern District of New York against 55 defendants engaged in the apple-growing industry in New York State.[1] The Commonwealth seeks to declare illegal and enjoin alleged discrimination in the hiring and treatment of Puerto Ricans as temporary agricultural laborers. The acts of defendants are claimed to be in violation of the Wagner-Peyser Act of 1933, as amended, 29 U.S.C. §§ 49–49k (Supp.1980), the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. §§ 1101–1524 (Supp.1981), and regulations promulgated thereunder.

Shortly prior to the commencement of this action the Commonwealth filed a suit in the United States District Court for the Western District of Virginia against 52 defendants engaged in the apple-growing industry. *Commonwealth of Puerto Rico ex rel. Quiros v. Alfred L. Snapp & Sons, Inc., et al.*, Civ. No. 79–0007 (W.D.Va. January 12, 1979). The complaint in the Virginia case is virtually identical to the one in the instant action.

The defendants herein moved to dismiss the complaint. One asserted basis for dismissal was that the Commonwealth lacked standing to prosecute the action. On April 17, 1979, Judge Turk of the Western District of Virginia, faced with the identical issue, filed a memorandum opinion and order dismissing the Commonwealth's complaint on the ground that it lacked standing as *parens patriae. Commonwealth of Puerto Rico ex rel. Quiros v. Alfred L. Snapp & Sons, Inc., et al.*, 469 F.Supp. 928 (W.D.Va. 1979). On September 28, 1979, Judge Duffy filed a memorandum granting defendants' motion to dismiss the action commenced in the Southern District of New York on the basis of the reasoning found in the decision of Judge Turk. However, the Court of Appeals for the Fourth Circuit subsequently reversed the decision of Judge

Turk, finding that the Commonwealth of Puerto Rico has standing as *parens patriae. Commonwealth of Puerto Rico ex rel. Quiros v. Alfred L. Snapp & Sons, Inc.*, 632 F.2d 365 (4th Cir. 1980). Thereafter, argument on this appeal was heard.

## FACTS

Each fall season thousands of temporary farm workers are needed by East Coast apple growers to bring in the apple harvest. Because workers are usually not available in adequate numbers in the immediate locality, growers have customarily employed both out of-state and foreign workers.

With respect to foreign labor, the Immigration and Nationality Act, as amended, 8 U.S.C. §§ 1101–1524 (Supp.1981), authorizes the admission of aliens to serve as temporary agricultural laborers only "if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii). The Immigration and Naturalization Service regulations insure the exhaustion of the domestic work force by requiring that a grower's petition for the admission of aliens must be accompanied by a certification from the Secretary of Labor that qualified domestic workers are not available. 8 C.F.R. § 214.2(h)(3). The temporary labor regulations issued by the Secretary of Labor provide that such certification will issue only after an active attempt to recruit domestic workers has been made. 20 C.F R. § 655.203(d).

The recruitment of domestic workers is usually undertaken through the Interstate Clearance System (the "ICS"), an interacting network of national, state and local employment offices established during the great depression by the Wagner-Peyser Act of 1933, as amended, 29 U.S.C. §§ 49–49k (Supp.1980). To utilize the ICS, a grower must accompany its application for certification to the Regional Administrator of the Department of Labor with a job offer for

---

1. Of the 55 defendants, 30 are employers and 25 are either officers, partners or employees thereof.

domestic workers which is referred to and circulated through the ICS network for at least sixty days. The application for certification of a need for foreign labor is granted or denied, in whole or in part, depending on the number of domestic workers who accept jobs through the ICS.

The background and allegations relating to discrimination by defendants against Puerto Rican farm workers are as follows:

In furtherance of its efforts to reduce unemployment, the Commonwealth, since 1976, has attempted to refer agricultural workers to the East Coast apple growers through the ICS. These efforts have met with resistance on the part of the apple growers who have traditionally employed Jamaican workers. In 1976 and 1977 few Puerto Ricans gained employment through the ICS. It has been established that the growers were legally justified in their unwillingness to hire Puerto Ricans in those years by the existence of Public Law 87 of the Commonwealth which required mainland employers to negotiate service contracts with Puerto Ricans containing provisions more onerous on the employer than those required by federal law, and further, subjected non-complying employers to possible criminal penalties. *Hernandez Flecha, et al. v. Quiros*, 567 F.2d 1154 (1st Cir. 1977), cert. denied, 436 U.S. 945, 98 S.Ct. 2846, 56 L.Ed.2d 786 (1978) (Public Law 87 rendered Puerto Rican workers "unavailable" within the meaning of the Immigration and Nationality Act).

In July 1978 the legislature of Puerto Rico attempted to remedy the problems which had been caused by Public Law 87 by approving an amendment which authorized the Secretary of Labor of Puerto Rico to exempt employers from its requirements. Immediately thereafter, the Secretary of Labor of Puerto Rico, Carlos Quiros, announced his intention to exempt from Public Law 87 the apple growers whose 1978 job orders would be transmitted through the ICS. The Department of Labor,

through the ICS, then cleared a total of 2,318 job orders for the East Coast apple harvest to Puerto Rico. On August 14, 1978, certification decisions were made. By that date, only two weeks after the job orders had been cleared to Puerto Rico, Secretary Quiros had already recruited 1,094 Puerto Rican workers. Certification applications of the defendant growers were denied, in whole or in part, because of the apparent availability of Puerto Rican workers to fill the 2,318 job orders.

After the certification applications were denied, but before all of the job orders were filled, a number of associations representing East Coast fruit growers filed an action in the United States District Court for the Western District of Virginia seeking an injunction ordering the Secretary of Labor to certify the unavailability of domestic workers for 1,460 jobs and ordering the Commissioner of the Immigration and Naturalization Service to issue 1,460 additional visas for Jamaican workers. The injunction was granted because it appeared unlikely that Puerto Rican workers would be available in sufficient numbers to timely begin the harvest.[2]

However, before the beginning of the harvest, Secretary Quiros successfully recruited all of the workers for whom job orders had been received through the ICS. Of the 2,318 workers recruited, 611 were assigned to work for the New York apple growers. In granting the injunction which admitted the Jamaican workers the district court warned the growers that they were not relieved of their responsibility to hire those domestic workers who were present to begin the harvest. Nevertheless, the growers failed to hire many of the Puerto Ricans who had been referred to them. As a result, of those Puerto Ricans recruited only 992 left for the mainland. Flights for the remainder were cancelled following a request to Secretary Quiros by the United States Department of Labor that any fur-

---

**2.** *Frederick County Fruit Growers Association, Inc. v. F. Ray Marshall, et al.*, 78 Civ. 0086(H) (W.D.Va. August 31, 1978), *appeal dismissed and remanded*, 594 F.2d 857 (4th Cir. 1979).

ther referrals be cancelled since many of the growers were refusing to employ the Puerto Rican workers who had already arrived at the orchards. Of the 386 Puerto Ricans who ultimately arrived at the New York orchards, fewer than 50 were employed to work through the 1978 harvest.

## DISCUSSION

■ In order to present a justiciable case and controversy a litigant must possess a sufficient interest in the outcome of the action. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). In its capacity as *parens patriae* a state, and here, the Commonwealth,[3] may sue to "prevent or repair harm to its 'quasi-sovereign' interests." *Hawaii v. Standard Oil Co. of Calif.*, 405 U.S. 251, 258, 92 S.Ct. 885, 889, 31 L.Ed.2d 184 (1972).[4] A state possesses and may assert a quasi-sovereign interest in its general economy, *Georgia v. Pennsylvania*

*Railroad Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), and in protecting the welfare of its citizens, *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923).[5] The asserted quasi-sovereign interests will be deemed sufficiently implicated to support *parens patriae* standing only if "the injury alleged affects the general population of a State in a substantial way." *Maryland, et al. v. Louisiana*, —— U.S. ——, ——, 101 S.Ct. 2114, 2124, 68 L.Ed.2d 576 (1981). The general population need not be directly affected for "even where the most direct injury is to a fairly narrow class of persons, there is precedent for finding state standing on the basis of substantial generalized economic effects." *Commonwealth of Pennsylvania, by Shapp v. Kleppe*, 533 F.2d 668, 675 (D.C.Cir.), *cert. denied*, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976). Thus, in *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 65

**3.** As a Commonwealth of the United States, Puerto Rico may represent its citizens as *parens patriae*. *Commonwealth of Puerto Rico ex rel. Quiros v. Alfred L. Snapp & Sons, Inc., et al.*, 632 F.2d 365, 369 (4th Cir. 1980). The Department of Labor of Puerto Rico is under a statutory duty to promote the interests of laborers. 3 P.R. Laws Ann. §§ 305–06. It is in fulfillment of this obligation that the Secretary of Labor brings this action.

**4.** The term *parens patriae* was traditionally used to refer to "the King's power as guardian of persons under legal disabilities to act for themselves," which function passed to the states in this country. *Hawaii v. Standard Oil Co. of Calif.*, 405 U.S. 251, 257, 92 S.Ct. 885, 888–89, 31 L.Ed.2d 184 (1972).

Most of the decisions dealing with the right of a state to sue as *parens patriae* have been made in the context of suits between states or by one state against a citizen of another state in which the original jurisdiction of the Supreme Court has been invoked pursuant to Article III, § 2 of the United States Constitution. Nevertheless, the basic principles of *parens patriae* standing discussed in those cases have application to suits by a state against a citizen of another state at the district court level. In order to properly invoke the original jurisdiction of the Supreme Court a state must initially prove that the lawsuit has been brought to protect state interests and not those of its individual citizens. *Maryland, et al. v. Louisiana*, —— U.S. ——, ——, 101 S.Ct. 2114, 2124, 68 L.Ed.2d 576 (1981). Additional considerations

are involved in a determination of whether to exercise jurisdiction in original suits. In all such suits the Court will exercise jurisdiction only when plaintiff has "established the 'strictest necessity' required for invoking [the] Court's original jurisdiction." *Maryland, et al. v. Louisiana*, —— U.S. at ——, 101 S.Ct. at 2136 (Rehnquist, J., dissenting) (quoting *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493, 505, 91 S.Ct. 1005, 1013, 28 L.Ed.2d 256 (1971). Eleventh Amendment considerations are also involved in suits between states. *See, e. g., New Hampshire v. Louisiana*, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883).

**5.** The quasi-sovereign interest first recognized was that "independent of and behind the titles of its citizens, in all the earth and air within its domain," *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907), which allowed states to proceed as *parens patriae* to protect their vital natural resources. *E. g., New York v. New Jersey*, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921) (suit to enjoin New Jersey from directing sewage into New York Bay); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) (suit to enjoin manufacturing company from discharging noxious gas over five Georgia counties); *Kansas v. Colorado*, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907) (suit to enjoin the diversion of water from the Arkansas River); *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901) (suit to enjoin discharge of sewage into the Mississippi).

S.Ct. 716, 89 L.Ed. 1051, it was held that the state had standing to enjoin a conspiracy to fix anti-competitive rail rates. While it was the rail companies that were directly affected by the overcharges, the Supreme Court recognized that the citizens of the state indirectly suffered substantially from the alleged violation:

> Georgia as a representative of the public is complaining of a wrong, which if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected.

324 U.S. at 451, 65 S.Ct. at 723. Similarly, in *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901), where Missouri was granted leave to file a bill seeking to enjoin the discharge of sewage into the Mississippi, it was recognized that "substantial impairment of the health and prosperity of the towns and cities of the state situated on the Mississippi river, including its commercial metropolis, would injuriously affect the entire state." 180 U.S. at 241, 21 S.Ct. at 344. *Accord, Kansas v. Colorado*, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907).

■ In the instant case, all future migrant workers who might be refused employment due to the alleged unlawful discrimination, and the families of these workers, stand to be directly injured. Even if those directly injured are not substantial enough in number for their interests to be deemed "public," and therefore properly litigated by the state, *compare Maryland, et al. v. Louisiana*, —— U.S. ——, 101 S.Ct. 2114, 68 L.Ed.2d 576; *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117, a broader range of state interests beyond those of the workers are involved. The Commonwealth's efforts to secure the rights of migrant workers will most significantly benefit the general population whose welfare is dependent upon the health of the Puerto Rican economy.

The activities of the growers will significantly affect the economy of Puerto Rico. While the impact on the economy of the unemployed status of the workers and the care of their families is the Commonwealth's concern, the harm is more fundamental and pervasive. Puerto Rico is confronted with an average adult unemployment rate of 18.5%. For many years the Commonwealth government has attempted to alleviate unemployment by placing Puerto Rican workers in jobs on the mainland. In the period of 30 years prior to 1978, 350,000 Puerto Rican workers were placed in agricultural and non-agricultural jobs on the mainland. In 1978, 3,967 workers were actually placed in agricultural jobs outside the apple industry.[6] The figures reflect the importance of migrant labor to the economy of Puerto Rico. The Fourth Circuit described the injury resulting from discrimination against Puerto Rican workers as follows:

> The number of farm workers temporarily employed annually [by the defendants] does not accurately measure the potential effect of the damaged recruitment efforts on all of Puerto Rico's citizens. The island's officials are coping with an almost unmanageable unemployment problem. Its economy is in dire straits. The morale of the average Puerto Rican citizen under the circumstances can be expected to be extremely low. Deliberate efforts to stigmatize the labor force as inferior carry a universal sting.
>
> ... The apparent inability of the United States government, through the Department of Labor, to grant Puerto Ricans equal treatment with other citizens or even with foreign temporary workers must certainly have an effect which permeates the entire island of Puerto Rico.

---

**6.** Affidavit of Manuel Rodriguez Escalera, Assistant Director, Migration Division, Department of Labor (March 21, 1979).

Residual injuries to the Commonwealth effort are, to say the least, very serious. *Commonwealth of Puerto Rico ex rel. Quiros v. Alfred L. Snapp & Sons, Inc.*, 632 F.2d at 370. A statewide conspiracy to discriminate against Puerto Ricans by apple growers who except for such discrimination would have employed a significant number of Puerto Rican laborers will adversely affect the continuing effort of the Commonwealth to secure work for its citizens.

█ A final factor to consider in determining whether to allow a state to proceed as *parens patriae* is "the presence or absence of a more appropriate party or parties capable of bringing suit." *Commonwealth of Pennsylvania, by Shapp v. Kleppe*, 533 F.2d at 675. While this consideration is derived from the traditional concept of *parens patriae*, that is, the King's power as guardian of persons under legal disability to act for themselves, a state seeking to proceed as *parens patriae* need not demonstrate the inability of private persons to obtain relief if *parens patriae* standing is otherwise indicated. *See, e. g., Maryland et al. v. Louisiana,* —— U.S. ——, 101 S.Ct. 2114, 68 L.Ed.2d 576; *Georgia v. Pennsylvania Railroad Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051. Rather, "[t]he arguments in favor of allowing such standing become less compelling, as it becomes more feasible to achieve complete relief through suits by the parties actually aggrieved." *Commonwealth of Pennsylvania, by Shapp v. Kleppe*, 533 F.2d at 675 n.42. In this case, it is unlikely that the individual Puerto Ricans who were injured by the alleged discrimination in 1978 will achieve the complete relief sought by the Commonwealth.

First, the individual workers are separated from the mainland, which would make litigation of the individual claims difficult and costly. There is no assurance that the individual workers could bear the cost of a lawsuit that would achieve complete relief. Moreover, the interests of the individual laborers who were deprived of employment in 1978 are not necessarily coextensive with those of the public which the Commonwealth represents. Thus, even if the workers could marshal the resources to institute and effectively prosecute actions or a class action in their own behalf, there is no assurance that all named defendants herein would be sued or that relief against widespread and future discrimination would be actively pursued.[7] The vindication of the rights of all future migrant laborers and the public of Puerto Rico should not be made dependent upon the possible relief obtained by the individual workers.[8]

Accordingly, we believe that the Commonwealth of Puerto Rico has standing as *parens patriae* to litigate this action. The decision of the district court is reversed and the cause is remanded for further proceedings.

---

**7.** Shortly after this action was dismissed by the district court a class action suit was filed on behalf of mainland and Puerto Rican migrant workers against certain New York apple growers. The suit was brought in part by 13 Puerto Rican workers involved in the 1978 harvest who seek damages and injunctive relief against some of the same defendant apple growers sued by the Commonwealth in this case. *Juan Valderrama Rios, et al. v. Secretary of Labor F. Ray Marshall, et al.,* No. 79 Civ. 5711 (S.D.N.Y. October 22, 1979).

**8.** We also note that the Commonwealth in this case seeks injunctive relief only. Therefore, even if the individual workers were successful in recovering damages from some or all of the growers there would be no possibility of double recovery in damages. Such a possibility would weigh against a finding of *parens patriae* standing. *Hawaii v. Standard Oil Co. of Calif.,* 405 U.S. at 261–62, 92 S.Ct. at 891.